COMMONWEALTH vs. ANTONE CHARLES COSTA.

Barnstable. September 14, 1971. — November 1, 1971.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & HENNESSEY, JJ.

*Homicide. Insanity.*

At the trial of indictments charging murders in the first degree of two
girls, there was no error in the denial of motions for directed
verdicts, although evidence in support of the defence of insanity
included testimony from a number of witnesses as to the
defendant's frequent use of various harmful drugs, evidence that
the bodies of the victims after death had been dismembered and
severely mutilated and sexually abused by the defendant, and
testimony of two psychiatrists that the defendant had not possessed
substantial capacity to appreciate the criminality of his conduct or
substantial capacity to conform his conduct to the requirements of
the law, where evidence to negate the defence included testimony
from two other psychiatrists that the defendant suffered from no
more than a personality disorder, support from all medical
witnesses in some measure that the defendant was sane, and much
circumstantial evidence warranting inferences that he was capable
of deliberate premeditation and killed the victims with deliberately
premeditated malice aforethought. [180–184]

At the trial of indictments for the murders of two girls by successive
gunshots into the neck and head areas of the victims, where there
was no evidence that the defendant was attacked, assaulted, or
provoked into reciprocal violence against them or that the deaths
were unintentionally caused, there was no error in the judge's
refusal to instruct the jury that they would be warranted in finding
the defendant guilty of manslaughter. [184–185]

At the trial of murder indictments, where the defence was insanity
and the defendant was convicted of murders in the first degree,
there was no error in the judge's failure to instruct the jury that
verdicts of manslaughter would be warranted if they found that
diminished mental capacity not amounting to legal insanity
rendered the defendant incapable of harboring malice
aforethought. [185–186]

Summary of a complete and correct charge to the jury at the trial of
indictments for murders in which insanity was raised as a defence.
[185–186]

Commonwealth *v.* Costa.

There was no error at the trial of murder indictments, where the defence was insanity induced by the frequent use by the defendant of certain harmful drugs, the nature and properties of which were presented in detail by several medical witnesses, in the judge's declining to bring before the jury by requested instructions certain language of this court in *Commonwealth* v. *Leis*, 355 Mass. 189, relating to the "mind-altering" nature of certain drugs and narcotics, some of which were similar to those involved in the case at bar, and their effects upon mental disorders. [186–187]

Upon review of capital cases under G. L. c. 278, § 33E, in which the defence was insanity and the defendant was convicted of murders in the first degree and there was substantial and weighty evidence to support all of the subsidiary findings implied by the verdicts, this court declined to disturb the judgments notwithstanding the evidence of impaired mental capacity and drug involvement of the defendant. [187]

INDICTMENTS found and returned in the Superior Court on April 8, 1969.

The cases were tried before *Beaudreau, J.*

*Maurice M. Goldman* for the defendant.

*Richard C. Paull,* Assistant District Attorney (*Philip A. Rollins,* District Attorney, with him) for the Commonwealth.

HENNESSEY, J. At a trial subject to G. L. c. 278, §§ 33A–33G, Costa was found guilty by a jury on two indictments charging him with murder in the first degree of Patricia H. Walsh and Mary Ann Wysocki. The jury recommended that the death penalty not be imposed. The cases are before us on Costa's appeals with summaries of the record, a transcript of the evidence, and assignments of error.

The argued assignments of error relate to the denial of Costa's motions for directed verdicts addressed to both indictments, the refusal of the trial judge to charge the jury that they were warranted in returning verdicts of guilty of manslaughter, and the refusal of the judge to instruct the jury concerning the properties and effects of certain harmful drugs.

We summarize the evidence. On Friday, January 24, 1969, Patricia H. Walsh and Mary Ann Wysocki, each about twenty-three years of age, traveled from Providence, Rhode Island, to Provincetown, Massachusetts, in Miss Walsh's

light blue Volkswagen automobile. They registered for two nights at a guest house operated by one Mrs. Morton. Mrs. Morton introduced the girls on that day, January 24, to Costa, who was also staying as a paying guest at the house. The next morning Mrs. Morton discovered a note pinned to the door of the girls' room which asked, "Could you possibly give me a ride to Truro early in the morning. ' The note was signed, "Tony." This was the name by which Costa was commonly known.

Later that same day (Saturday, January 25), between noon and 2 p.m., Costa was seen riding as a passenger in a light colored Volkswagen by a friend of his named Zackarias. Two girls were also in the Volkswagen; one of the girls was driving. Costa hailed Zackarias, the two men conversed, and Zackarias delivered to Costa a check belonging to Costa which had issued from the common employer of both men. The Volkswagen was then driven in the direction of Truro. Later that afternoon the two girls failed to keep an appointment to meet with one Russell Norton at Provincetown.

The following day, Sunday, January 26, Mrs. Morton found a note tacked to the door of the girls' room: "We are checking out. Thank you for your many kindnesses." It was signed, "Mary Ann and Pat." It was written on the same type of paper as had been the note of the previous day. Personal property belonging to the girls was missing from the room. Later that day, Mrs. Morton saw Costa in the house.

On Wednesday, January 29, Costa asked a gasoline station owner what he would charge "to paint a Volkswagen . . . some exotic color." On Sunday, February 2, a witness saw the Walsh Volkswagen parked about thirty feet inside a wooded area in Truro. On that same day Costa asked two friends to ride to Boston with him, told them that he had a car in Truro and that he was sure it would start because he had been out there a week ago and it had started all right. Costa and his two friends went to the wooded area in Truro and from there drove to Boston in the Walsh

Volkswagen.   Costa told his two friends that two girls had given him the car and they were going to Canada.

While in Boston, Costa made inquiry as to where he could procure a fake driver's license, registration and bill of sale He also offered to sell to two friends a .22 caliber pistol which he said was buried in the woods in Truro.   On February 7, Costa rented a parking space for the Walsh vehicle and attempted to register it in his own name at Burlington, Vermont.   The Rhode Island license plates were later found concealed under a rubber mat within the vehicle.   On February 8, personal property of the two girls was found in Costa's room at the Morton house.

In the subsequent several days Costa told the police by telephone and in person three mutually inconsistent versions concerning his last contact with the girls and the manner in which he came into possession of Miss Walsh's automobile.   On March 3, 1969, a telegram from New York City addressed to Costa arrived at his mother's home in Provincetown.   It was signed "Pat and Mary Ann." Costa's mother took it to the police.   It was later shown that the telegram originated from a New York City telephone number to which Costa had access.

On March 5, 1969, and the several days thereafter, police officers uncovered two graves in a wooded area of Truro containing the dismembered remains of the two girls.   A .22 caliber pistol was found buried nearby.   It was later identified as Costa's gun.   The death of Miss Walsh was shown to have been caused by a gunshot wound in the neck, while Miss Wysocki died as a result of a gunshot wound in the brain from the left side of the head.   Miss Wysocki had also been shot a second time in the head.   Three expended .22 caliber shells were found near the graves and there was expert testimony that they had been fired from the Costa gun.   Blood stains were found both on a piece of rope in Costa's room and on a pair of Costa's boots.

1. Assignment 1 alleges error in the trial judge's denial of Costa's motions for directed verdicts as to both indictments.   Costa correctly concedes that the jury were war-

ranted in concluding that he perpetrated the homicides. He argues, however, that the evidence concerning Costa's mental state was such as to preclude the return of any guilty verdicts, and to require that verdicts of not guilty by reason of insanity be returned.[1] He further argues, in the alternative, that directed verdicts were required as to so much of the indictments as alleged first degree murder because (1) there was no evidence to warrant a finding of deliberate premeditation, and (2) the evidence of his mental state required a finding that he was incapable of deliberate premeditation.

The trial judge's rulings were correct. All questions were for the jury to decide. As discussed elsewhere in this opinion, the jury were correctly charged as to the rules of law applicable to the mental condition of Costa. The charge on first degree murder was predicated solely upon deliberate premeditation. No instructions were given upon felony murder or extreme atrocity or cruelty (G. L. c. 265, § 1) as basis for first degree murder, presumably upon the reasoning that the evidence would permit of neither conclusion. Although the bodies had been dismembered and showed evidence of severe mutilation, as well as evidence of sexual abuse, the trial judge ruled that the evidence did not permit an inference that these atrocities had been accomplished before death.

There was conflicting evidence as to Costa's mental capacity at the time of the crimes. From the testimony of a number of witnesses, the jury could infer that Costa from 1965 up to about the time of the homicides was a frequent user of such drugs as amphetamines, barbiturates, LSD, methadrine, hashish, solacen, nembutal and marihuana; that he took the drugs orally and by injection; that Costa was drug dependent, and that he had been "stoned" and "high" on frequent occasions. There was medical testi-

---

[1] The words "sane," "insane," "sanity" and "insanity" as used in this opinion relate only to the test of criminal responsibility prescribed in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546–547, 555.

mony concerning the tendency of such drugs to affect adversely the mental capacity of the user.

The bizarre nature of the killings is also offered as evidence of insanity. Testimony of a pathologist established that the body of Miss Walsh was cut in two pieces at the midline of the abdomen and the body of Miss Wysocki was cut in five pieces, one consisting of the head, the second the upper portion of the torso, the third the pelvis, the fourth the right lower extremity and the fifth the left lower extremity. With respect to Miss Walsh, it appeared that death was effected by means of a single gunshot wound entering from the back of the neck and that, after death, the skin was peeled off the chest "in a fashion like a sweater, so that it was attached only about the shoulders." During the autopsy, post mortem incised wounds or stab wounds were found perforating the entire thickness of the chest wall and fracturing one of the ribs. With reference to Miss Wysocki, there was a gunshot wound through the back of the head and another gunshot wound, which caused her death, was found on the left side of the head. The buttocks showed many stab wounds, "big slashes," which involved both the skin and the underlying muscles and soft tissues. Stab wounds were also present in the chest and the skin was again peeled, creating a sweaterlike effect. The pathologist testified that the mutilation and dismemberment of the bodies were done after death and that his findings were consistent with the psychiatric condition known as necrophilia, that is, the perverse sexual attraction to dead bodies. The pathologist further described the numerous stab wounds and slashing-type wounds, which he inferred from his findings were all inflicted after death. In each case there was evidence of sexual abuse.

Four psychiatrists testified before the jury. Two of these doctors expressed opinions that Costa was a borderline schizophrenic whose mental capacity had been further seriously diminished by the use of various harmful drugs. From their testimony the jury could have concluded that

Costa did not possess the substantial capacity to appreciate the criminality of his conduct or the substantial capacity to conform his conduct to the requirements of the law. *Commonwealth* v. *McHoul,* 352 Mass. 544, 546–547. The other two medical witnesses testified that Costa suffered from no more than a personality disorder. From each and every one of the several medical witnesses the jury heard opinions that supported in some measure a conclusion of sanity on the part of Costa. Nor were the jury bound to accept the opinion of any expert. *Commonwealth* v. *Ricard,* 355 Mass. 509, 513–515. *Commonwealth* v. *Hartford,* 346 Mass. 482, 489–490. Viewed alone, the sum total of all the expert psychiatric evidence created a jury question as to the criminal responsibility of Costa.

The jury were properly instructed that from the fact that a great majority of people are sane they could infer that any particular man is probably also sane. We have held that this rule without more is sufficient to warrant a jury in concluding that a defendant was sane and requires the trial judge to submit the issue of sanity to the jury. *Commonwealth* v. *Smith,* 357 Mass. 168, 176.

There was also much circumstantial evidence from which the jury could properly infer that Costa was sane, that he was capable of deliberate premeditation, and that he killed the two girls with deliberately premeditated malice aforethought. This evidence they could consider in the light of the appropriate instruction to them that only a brief period of time may be sufficient to constitute evidence of deliberate premeditation. *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 230. The jury could find that Costa left a note on the door of the girls' room and thereafter maneuvered them in the Walsh Volkswagen to an isolated wooded area for the purpose of killing them without being discovered. He carried a pistol with him or had it hidden at the scene in advance. He had a knife and probably other cutting instruments also available. He carried out intelligently the procurement of his paycheck from a friend, on the same

day as the killings and probably at most within a matter of hours before the killings. He accomplished two successive killings by gunshots. He concealed the bodies and the murder gun by burying them. He parked the Walsh automobile in a wooded area. He wrote a note and left it on the door of the girls' room the day after the killings to persuade Mrs. Morton that the girls had checked out, and he secretly cleared all of the girls' personal property out of their room. He concealed the Walsh vehicle in remote cities, inquired as to having it painted, and sought to procure false documents concerning it. Finally he sought by several elaborate but ineffective schemes to persuade the police that the girls had left Massachusetts and that he was blameless as to their disappearance.

2. There was no error in the refusal by the trial judge to instruct the jury that they were warranted in finding Costa guilty of manslaughter (assignment 2). It is well established that where evidence in a murder prosecution is such that a jury could find a defendant guilty of manslaughter rather than murder it is reversible error to refuse to give such an instruction on manslaughter. *Commonwealth* v. *Campbell,* 352 Mass. 387, 392, and cases cited. *Commonwealth* v. *McCauley,* 355 Mass. 554, 561–562. A trial judge is not required, however, to charge on an hypothesis which is not supported by evidence. *Commonwealth* v. *Kleciak,* 350 Mass. 679, 691–692. *Commonwealth* v. *McCann,* 97 Mass. 580, 582. *Commonwealth* v. *Levenson,* 250 Mass. 440, 444–445. *Commonwealth* v. *Dawn,* 302 Mass. 255, 262.

There is no necessity here to define voluntary and involuntary manslaughter, since those matters were discussed comprehensively in a recent opinion of this court. *Commonwealth* v. *Campbell,* 352 Mass. 387, 396–398, and cases cited. Considering all the evidence, together with permissible inferences, we conclude that neither a finding of voluntary manslaughter nor a finding of involuntary manslaughter was warranted here. There was no evidence from which the jury could infer that the accused was attacked, assaulted, or provoked into reciprocal violence against the deceaseds.

Nor was there evidence to support a conclusion that the deaths were unintentionally caused. A significant fact which tends to negate any consideration of manslaughter is that this was a double homicide caused by successive gunshots into the neck and head areas of the two victims.

The defence also contends that the jury should have been instructed that verdicts of manslaughter were warranted if they found that diminished mental capacity not amounting to legal insanity rendered Costa incapable of harboring malice aforethought. Some other jurisdictions have held that verdicts of manslaughter are warranted in some cases of intentional killings perpetrated by defendants of diminished or defective mentality. *People* v. *Wells*, 33 Cal. 2d 330. *People* v. *Gorshen*, 51 Cal. 2d 716. *People* v. *Conley*, 64 Cal. 2d 310. *State* v. *Nichols*, 32 Ohio Op. 2d 271. *State* v. *Schleigh*, 210 Ore. 155, 181. *State* v. *Green*, 78 Utah, 580. It has also been held that this diminished mental capacity sufficient to reduce the crime to manslaughter may originate from voluntary intoxication. *People* v. *Conley, supra.* Some other jurisdictions have refused to permit evidence of an abnormal mental condition not amounting to legal insanity to be considered by the jury for any purpose. *State* v. *Janovic*, 101 Ariz. 203, cert. den. sub nom. *Janovic* v. *Arizona*, 385 U. S. 1036. *Armstead* v. *State*, 227 Md. 73. *State* v. *Holloway*, 156 Mo. 222. *State* v. *Flint*, 142 W. Va. 509, cert. den. sub nom. *Flint* v. *West Virginia*, 356 U. S. 903. This has long been the rule in Massachusetts (*Commonwealth* v. *Cooper*, 219 Mass. 1, 4–6), except as modified by the rule which permits consideration of second degree murder in cases of voluntary intoxication. *Commonwealth* v. *Taylor*, 263 Mass. 356, 362–363. *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 617.

The charge to the jury here was correct and complete and in accordance with established principles of Massachusetts law. We briefly summarize these aspects of the charge: (1) that the Commonwealth must prove beyond a reasonable doubt that Costa killed the two girls and, since insanity was raised as a defence, that at the time he had sufficient

mental capacity within the meaning of the dual tests set out in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546–547; (2) that upon a failure of the Commonwealth to sustain its burden of proving mental competency verdicts of not guilty by reason of insanity must be returned by the jury if they found that Costa killed the girls; (3) that in determining whether Costa was sane at the time of the crimes the jury could consider that the majority of men are sane and the resulting probability that any particular man is sane. *Commonwealth* v. *Francis*, 355 Mass. 108. *Commonwealth* v. *Ricard*, 355 Mass. 509; (4) that if the jury found that Costa at the time of the homicides was so affected by his voluntary use of harmful drugs and narcotics as to be incapable of deliberate premeditation then the jury would be warranted in returning verdicts no greater than guilty of murder in the second degree. *Commonwealth* v. *Taylor*, 263 Mass. 356, 362–363. *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 617–618. Compare *Commonwealth* v. *McGrath,* 358 Mass. 314, for the rule in drug related homicide during armed robbery.

The judge further charged in substance that if the jury should conclude that Costa was incompetent under the dual *McHoul* tests by reason of his use of drugs, but that his use of drugs arose out of uncontrollable addiction or drug dependency, then the jury would be warranted in concluding that this use of drugs was involuntary and further warranted in returning verdicts of not guilty by reason of insanity. We have some doubt whether Costa was entitled to this instruction upon the evidence in this case but we do not reach this issue, since in any event he was not prejudiced by an instruction that was more favorable to him than was warranted.

We reject the argument that Massachusetts law should now be changed to require manslaughter to be submitted to the jury as a permissible verdict in this case based upon the evidence of Costa's impaired mental capacity.

3. Assignment 3 concerns Costa's exceptions saved when the trial judge declined to charge the jury in accordance

with several of Costa's requests for instructions addressed to *Commonwealth* v. *Leis,* 355 Mass. 189. These requests for instructions sought to bring before the jury certain language of this court in that case related to the "mind-altering" nature of certain drugs and narcotics, and their effects upon mental disorders. Some of the drugs discussed in the *Leis* case are similar to those involved in this case. There was no error. The essence of Costa's requests was an attempt to import into this case the conclusions of fact recited in the *Leis* opinion as based upon the evidence there previously presented in the trial court and the findings of the trial judge in that case. Furthermore, the nature and properties of the drugs used by Costa were presented in detail before the jury by the several medical witnesses. No contention is made that the judge limited the opportunities of defence counsel to explore this area of evidence.

4. Since this is a capital case, we turn now to the further duty incumbent upon us under G. L. c. 278, § 33E. As required by that statute, we have reviewed the law and the entire record of this case. The defence urges us to award a new trial or to direct the entry of a verdict of a lesser degree of guilt, because of the evidence of impaired mental capacity and drug involvement of Costa. We decline to do so. As we have ruled, there was sufficient evidence to warrant the verdicts of the jury, but more than that there was substantial and weighty evidence to support all of the subsidiary findings that are implied in the verdicts.

*Judgments affirmed.*