COMMONWEALTH *vs.* JOSEPH RAVIDA.

Suffolk.    May 3, 1976. — October 21, 1976.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Capital case.    *Homicide.    Insanity.*

Where a jury trial which resulted in the conviction of a defendant for murder in the second degree was fairly and well conducted and where the jury's choice of a verdict of murder in the second degree

as against a verdict of manslaughter was quite understandable and reasonable, there was nothing in the record which would compel this court to reduce the verdict under G. L. c. 278, § 33E. [248-249]

INDICTMENT found and returned in the Superior Court on June 20, 1973.

The case was tried before *McNaught, J.*

*Richard S. Goldstein* for the defendant.

*Peter D. Feeherry,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Some time after 11 P.M. on April 27, 1973, Mrs. Maria Marshall was bludgeoned to death on the sidewalk adjacent to 1 Mt. Hope Street in Roslindale, Boston. There is no doubt that the defendant Joseph Ravida wielded the mortal weapon. Indicted for murder in the first degree, he was convicted after jury trial of murder in the second degree and given the mandatory sentence of life imprisonment. On the present appeal under G. L. c. 278, §§ 33A-33G, it is not suggested on behalf of the defendant that there was any error of law on which to base a reversal. A reading of the transcript indeed shows that the trial was well conducted: counsel on both sides brought out the facts with moderation as well as skill, and the judge guided the adduction of the proof and finally charged the jury with care and with scrupulous fairness to the accused. Thus the defendant applies to this court only for possible mitigation of the verdict under G. L. c. 278, § 33E (quoted in part in the margin).[1] We find no reason for such action. The highlights of the testimony will be stated briefly.

On the afternoon of April 27 the victim, her sister Mrs. Charlotte Isaacs, the defendant, and one William Hight were drinking beer in the victim's apartment on the second

---

[1] "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence."

floor of 1 Mt. Hope Street. There had probably been considerable drinking by these persons earlier that day. The four were well known to one another. Mrs. Isaacs was or had been the defendant's girl friend. Hight was a kind of hanger-on. According to Hight's testimony, the defendant left the apartment with the victim and Mrs. Isaacs between 5 and 6 P.M.; Hight surmised that they were going to a barroom around the corner to continue their drinking. Hight remained in the apartment to serve as baby-sitter for the victim's two children.

The story is continued in testimony of Mrs. Catherine Avelino. Shortly before 11 P.M., while watching television in a bedroom of her house at 9 Mt. Hope Street (separated from No. 1 by an open lot), Mrs. Avelino heard loud voices. Looking out the window, she recognized the defendant, the victim, and Mrs. Isaacs. They were at the defendant's parked car in front of 1 Mt. Hope Street, at a distance of about twenty-six feet from Mrs. Avelino; the place was fairly well lit by street illumination. They seemed to be having an argument (or, possibly, saying loud good-byes). Mrs. Avelino went back to her television set. The sounds continued for a few minutes.

During the news broadcast which started at 11 P.M. Mrs. Avelino was drawn again to the window by sounds of screaming. She saw the defendant on the sidewalk near his parked car "going down and down and down" with what appeared to be a metal pipe. He threw the pipe to his left; making a "wild" sound, he went out to the middle of the street; he stumbled somewhat, came toward No. 9, picked up a bottle, then changed direction and walked up the rear stairs of No. 1. Mrs. Avelino saw Mrs. Isaacs on the street side of the parked car; as the defendant went up the stairs, Mrs. Isaacs walked down the block to the junction of Mt. Hope Street and Hyde Park Avenue and turned the corner.

Testimony of Mrs. Barbara Walsh confirmed the substance of Mrs. Avelino's account from the time of the screaming sounds through the departure of Mrs. Isaacs. Mrs. Walsh had a view of the scene from her apartment

on the second floor of 6 Mt. Hope Street opposite No. 1. She saw some ten downward strokes of a bar in the defendant's hands; she thought the defendant was striking in anger a car parked next to the defendant's car.[2]

Police arrived shortly in response to a call from Mrs. Avelino who, in a flash of headlights from a passing car, had seen the figure of a person lying on the sidewalk where the blows of the metal pipe might have fallen. The body was that of Maria Marshall, her head smashed and running blood to the curb, fragments of teeth and bone scattered about her; she had died (according to the medical examiner) of multiple fractures of the skull caused by blows to the head with a blunt instrument — in fact, a bumper jack found in the place indicated in the testimony of the two neighbors. Patrolman Robinson, informed by Mrs. Avelino where the defendant had gone, went into No. 1. Robinson found the defendant in the victim's apartment sitting at the kitchen table. He was spattered all over with blood. Hight was present in the room. Robinson placed the defendant under arrest immediately and gave him Miranda warnings. Hight testified that when the defendant came into the apartment some minutes before his arrest, he said, "I'm in trouble" or "I think I'm in trouble."

The defendant testified in his own behalf. He rambled into irrelevancies but the substance, much at variance with the evidence summarized above, was as follows. He left the victim's apartment about 5 P.M., went to his parked car, and fell asleep in the driver's seat. The victim did not leave the apartment with him. Mrs. Isaacs probably followed him and in all events was in the car in the seat next to him, also asleep, when the fatal incident occurred. He was awakened suddenly by a banging on the closed window beside him. Believing one or more persons intended to

---

[2] Mrs. Walsh also testified that on arriving at her house from a shopping trip that night — she put it between 10:30 and 10:45 P.M. — she observed Mrs. Isaacs "sort of ... [falling] out of" a rear door of the defendant's car and speaking in a loud voice. Mrs. Walsh went upstairs to her apartment and later made the observations noted in the text.

break in and rob him, he turned and seized a bumper jack from behind the front seat, clambered over Mrs. Isaacs,[3] and came out the door on her side (the door on the driver's side being jammed).[4] His purpose was to make his way to the victim's apartment to get help. On the sidewalk he encountered a figure which he took to be a man menacing him. He struck at the figure twice with the bumper jack. He did not recognize the figure as the victim although he had known her for some five years (her height was about five feet, two and one-half inches): he said that on awakening his eyes were customarily closed or watery, a condition he linked to his asthma. He climbed the rear stairs and on meeting Hight in the apartment said that somebody tried to break into the car and he hit him and thought he knocked him out. He then sat down; he fell asleep again before being arrested. He was not bloodied; this was presumably an invention of the police.

It remains to add that although the defendant would deny having been drunk that night, there was testimony (not all consistent) that he appeared to be. He said he was in ill health with an arrested case of tuberculosis. A psychiatrist who had had a brief interview (between thirty minutes and an hour) with the defendant some days before trial, testifying on the defendant's behalf, expressed the opinion that the defendant tended to "confabulate," that is, to fill gaps in his memory with invented stories which he believed; and that, because of chronic alcoholism, aggravated perhaps by physical infirmity, the defendant's

---

[3] Mrs. Isaacs was called by the prosecution. Her English was limited, making comprehension quite difficult. (She, like the victim, was a Nova Scotian Indian; they had emigrated to Boston about five years earlier.) Mrs. Isaacs said in substance that she had remained in the apartment until 9 P.M., gone to the nearby barroom where she stayed until 12:30 A.M., then returned to the vicinity of 1 Mt. Hope Street where she saw her sister's body on the sidewalk.

[4] As the defendant's car, parked on the south side of Mt. Hope Street (an east-west street), was pointed west (toward Hyde Park Avenue), the driver's side of the car was alongside the curb. If the defendant clambered over Mrs. Isaacs and left the car on the passenger side, he would have had to circle around the car to reach the sidewalk and wield the bumper jack.

faculties had been impaired to the point where he had
diminished capacity to appreciate the criminality of his
conduct or to conform his conduct to the requirements of
law;[5] yet he was competent to stand trial and was not
"crazy" in the ordinary sense.

Against the background of all the testimony, the judge's
charge tendered to the jury every alternative verdict even
remotely available on the evidence — he explained murder
in the first degree for deliberately premeditated killing
with malice aforethought or for killing with extreme atroc-
ity or cruelty; murder in the second degree; manslaughter,
voluntary and involuntary; the possible effect of self-
induced intoxication as negating deliberate premeditation;[6]
self-defense and the possible effect of the use of excessive
force in self-defense; the nature of the mental disease or
defect that would exclude criminal responsibility. The
instructions were calculated to invite the jury to consider
the various hypotheses which might reduce the offense or
excuse it altogether. The jury's choice of a verdict of mur-
der in the second degree as against a verdict of manslaugh-
ter was quite understandable and reasonable. They might
well prefer the testimony of independent witnesses to the
defendant's own testimony, and decide that the defend-
ant's condition at the time should not palliate the crime
further than their verdict allowed. In the circumstances
the jury's view could claim particularly respectful consid-
eration by us in the exercise of our § 33E duty. Cf. *Com-
monwealth v. Deeran,* 364 Mass. 193, 197 (1973). But, that
apart, on a reading of the record we find no such question

---

[5] Note the cases indicating that diminished capacity does not relieve
of criminal responsibility if the person still has "substantial capacity"
within the standard of *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-
547 (1967). See *Commonwealth* v. *Fleming.* 360 Mass. 404, 407-408
(1971); *Commonwealth* v. *Costa,* 360 Mass. 177, 185 (1971).

[6] See *Commonwealth* v. *Costa,* 360 Mass. 177, 185 (1971); *Common-
wealth* v. *Appleby,* 358 Mass. 407, 415-416 (1970); *Commonwealth* v.
*DelleChiaie,* 323 Mass. 615, 617-618 (1949); *Commonwealth* v. *Soaris,*
275 Mass. 291, 299-300 (1931); *Commonwealth* v. *Taylor,* 263 Mass.
356, 361-363 (1928).

about the fundamental fairness of the result as would entitle us to act under the statute.[7]

*Judgment affirmed.*

---

[7] Our conclusion is reinforced by comparing the present situation with others in which § 33E relief of reduction to manslaughter (or remand for trial on that basis) has been granted. See *Commonwealth* v. *Mahnke,* 368 Mass. 662 (1975); *Commonwealth* v. *Jones,* 366 Mass. 805 (1975); *Commonwealth* v. *Kinney,* 361 Mass. 709 (1972); *Commonwealth* v. *Ransom,* 358 Mass. 580 (1971); *Commonwealth* v. *Kendrick,* 351 Mass. 203 (1966); *Commonwealth* v. *Baker,* 346 Mass. 107 (1963).