COMMONWEALTH *vs.* ROBERT GEORGE LEBLANC.

Suffolk.     April 4, 1977. — October 4, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Homicide. Arrest. Search and Seizure. Constitutional Law,* Search and seizure. *Probable Cause. Practice, Criminal,* Charge to jury, Examination of jurors, Motion to suppress. *Malice. Evidence,* Admissions and confessions.

A warrantless arrest of the defendant in his home was lawful where there was probable cause for the arrest and where the peaceful daytime entry into the defendant's home for the purpose of investigating a murder was justified by exigent circumstances. [483-486]

Statements made by the defendant after his arrest and after he had made a knowing and intelligent waiver of his right to remain silent were admissible at his trial even if the arrest was unlawful. [486-488]

Where an affidavit in support of a search warrant contained detailed information linking the defendant to a car identified as being at the scene of a murder and where the defendant had admitted owning a gun but gave an unconvincing story that he had sold it to a "strange kid," the judge did not err in ruling that the issuance of the search warrant was based on information sufficient to constitute probable cause and was valid. [488]

At the trial of a defendant charged with murder in the first degree, evidence of the circumstances in which a policeman was shot, including evidence that the defendant was present at the scene of the crime, and that several shots had been fired at the victim from two different guns, one of which belonged to the defendant and the other to his father, was sufficient to permit the jury to find that the defendant killed the victim with deliberately premeditated malice aforethought. [488-490]

Where there was no evidence in a capital case from which the jury could reasonably have found that the victim was killed upon reasonable provocation or sudden combat, or that his death was unintentionally caused, the judge did not err in refusing to instruct the jury on manslaughter. [490-492]

At the trial of a defendant charged with murder in the first degree, the judge did not err in instructing the jury that they might consider whether the amount of alcohol drunk by the defendant on the night of the killing had "reached that state which ... affected the mind with reference to the matter of premeditation." [492]

There was no error at a criminal trial in the judge's instructions on reasonable doubt. [492]

At the trial of a defendant charged with shooting a police officer, a witness's testimony that she had seen the defendant in possession of two guns prior to the day of the murder was admissible to establish the defendant's familiarity with guns and his practice of carrying guns. [492-493]

At the trial of a defendant charged with the murder of a police officer, the judge did not err in refusing to allow the defendant to examine the wife of the chief of police who was a member of the venire but was not called as a prospective juror. [493]

INDICTMENT found and returned in the Superior Court on November 14, 1975.

Pre-trial motions to suppress evidence were heard by *Zarrow, J.,* and the case was tried before him.

*Robert A. Stanziani* for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant was found guilty of murder in the first degree of police Sergeant Richard F. Halloran

and was sentenced to life imprisonment. In this appeal under G. L. c. 278, §§ 33A-33G, he presses various claims of error which may be grouped as follows: (1) the denial of motions to suppress statements and a gun, (2) the denial of motions for directed verdicts of acquittal of murder in the first and second degrees, and of lesser included offenses, (3) statements excluded from the judge's charge, (4) the admission of certain evidence, and (5) the denial of the request by the defendant to question a member of the venire who was not called as a prospective juror. We find no error, affirm the judgment, and decline to exercise our powers under G. L. c. 278, § 33E.

We summarize the evidence introduced at the trial and at the hearing on the defendant's motions to suppress, and the judge's findings on those motions. During the early morning of November 6, 1975, the victim, Richard F. Halloran, a sergeant in the Boston police department, was on patrol duty in East Boston. He was seen driving a police cruiser at 3:25 A.M. by one Frank Tavella. About 3:40 A.M., a police officer found Halloran wounded, unconscious, and lying on his back beside the cruiser on Bremen Street near the intersection of Neptune Road in East Boston. Halloran was holding his unfired service revolver in his hand, but his body showed no signs of a struggle. He was dead on arrival at a hospital ten minutes later. The cause of death was a gunshot wound through the chest by a .25 caliber bullet which penetrated the lungs and pierced the aorta.

At the trial, testimony was received from two witnesses who had driven by the scene near the time of the shooting and from three witnesses who had heard the gunfire. David O'Connell stated that he drove by about 3:25 A.M. and that he saw a police cruiser parked with its headlights on, and a slant-back small car parked ahead of the cruiser on the opposite side of the street. He did not see a police officer, but saw a man standing in the street and described him as about five feet nine inches tall, in his twenties, 170 to 180 pounds in weight, with a mod "bubble-type" haircut down to the back of his neck.

Anthony Messina drove through the intersection be-

tween 3:20 and 3:25 A.M., and saw a police cruiser parked behind a foreign car, burnt orange in color. He saw a man about five feet nine inches tall, 180 pounds in weight, with shoulder length hair, slamming the trunk of the orange car. When Messina later returned to the intersection, he passed a clock reading 3:33 A.M. and he noticed that the police cruiser remained parked and that the foreign car was gone. He saw the body of Sergeant Halloran and he started for the police station, but he returned to the scene when he saw a police cruiser arriving.

Three witnesses who heard the shooting made substantially consistent statements. As Frank Tavella unlocked the gates of his nearby restaurant, he heard four gunshots: one shot, followed by a pause, followed by three rapid shots. Alfredo Franciosa was awakened from sleep by three or four gunshots which sounded as though they were fired from two different guns. He then heard a car door slam, and the screeching of tires. Bartholemew Oliva heard one shot, two loud voices, then two more gunshots five or six seconds later. He heard screeching tires, and from his bedroom window he saw a dark orange, foreign-made car going up Bremen Street toward Curtis Street at a speed of forty to forty-five miles an hour.

Police investigators at the scene found a discharged .25 caliber cartridge casing and a spent .25 caliber metal case bullet. A spent .38 caliber bullet was later found in the lining of the victim's jacket. A single skid mark extended from where the foreign car had been parked, and two long skid marks which matched the initial skid mark in width were discovered at the intersection of Curtis and Bremen streets, the direction the foreign car had taken. The left skid mark ended at a high granite curbstone on Curtis Street.

A piece of aluminum was stuck to the curb, and four broken pieces of amber plastic lens material were discovered nearby. These pieces were identified as coming from the left front directional signal of a 1974 Mazda RX-2 car. Oliva was shown such a car, and confirmed that it was the type of car he saw leaving the scene of the shooting.

Thus, several hours after the shooting, the police had discovered the color and kind of car that had left the scene, and knew the front end of the car was damaged from a collision with a curbstone. They also had two similar descriptions of a man in his twenties, about five feet nine inches tall, weighing 170 to 180 pounds, with full dark hair over his ears, who was seen standing near the police cruiser and the orange Mazda from 3:20 to 3:40 A.M., when the shooting occurred.

About 1 P.M. the following afternoon, the police discovered a 1974 dark orange Mazda parked at 51 Prescott Street, East Boston, with its left front directional light broken, and showing other damage similar to what police crime laboratory technicians had described would have happened in a collision with the curbstone.[1] The car was locked and its ignition appeared intact. While the officers were inspecting the car, a passerby approached them and identified herself as Mrs. LeBlanc. She asked what the problem was with this particular car, and she said that it belonged to her son, Robert LeBlanc, who lived nearby at 286 Princeton Street, and was home at that time. About 1:20 P.M., the police went to 286 Princeton Street, and asked to speak to Robert LeBlanc. LeBlanc was found in his third-floor bedroom; he appeared to the officers to be approximately twenty to twenty-two years of age, and had black bushy hair which covered his ears. The officers asked LeBlanc if he owned the orange Mazda, and he replied that he rented it. He was asked what time he parked it on Prescott Street and replied, "Sometime last night." He was asked if anyone else had access to the car and replied that he was the only one with a key to the car. At that point he was arrested for murder, and was taken to the police station.

---

[1] Two small pieces of amber plastic which were affixed to the directional signal light on the Mazda fitted the pieces found at Curtis Street exactly, and photographs of the signal light were introduced at trial. The aluminum frame which held the plastic was damaged, there were dents in both the front wheels, both front hub caps were missing, and the front undercarriage of the car was damaged.

He was given Miranda warnings, and then in response to police questioning stated that he had arrived home about 2:20 A.M. the morning of November 6, that he had parked the car where the police found it, and that he had let no one else use it. He had the key to the car in his pocket at the time of his arrest. He said he had stayed up until 5 A.M. listening to his police radio with his brother, and thereby knew of the shooting. He admitted having once owned a .22 or .25 caliber automatic pistol, but said he sold it to a "strange kid" for $20. He explained the damage to the front end of the rented car by stating he had struck a wall two days earlier while racing with his friend Freddie Almeida.

At the trial there was evidence which contradicted the defendant's alibi. Freddie Almeida denied being involved in any automobile accident with the defendant. Indeed, the manager of the car rental agency had inspected the car in the early evening of November 5, the day before the murder, and found no damage to the front end.

The defendant's brother testified that he had been asleep, and had not listened to the police radio during the morning of November 6. There was evidence that the defendant had been seen carrying both a large and a small gun numerous times preceding the murder. A witness whom the defendant had dated on many occasions testified that on November 2, 1975, she and the defendant fired his small gun out the window of a motel room.

After the defendant was arrested, and based to some extent on his statements, the police obtained a search warrant. On executing the warrant at 8:10 P.M. on the evening of November 6, they found a .25 caliber semiautomatic pistol hidden behind panelling in the cellar of the defendant's home. The bullet which killed the victim was fired from this gun.

Further factual discussion will appear as necessary to the discussion of the defendant's specific assignments of error.

1. The defendant first claims that his statements made at the police station should have been suppressed as the

fruits of his arrest which he contends was illegal because it was made (a) without probable cause and (b) in his home without a warrant, in alleged violation of *Commonwealth* v. *Forde,* 367 Mass. 798 (1975). For a variety of reasons, this argument is unpersuasive.

Since the defendant relies so heavily on the *Forde* decision, we assume, for purposes of argument, that that case furnishes the legal standards of police conduct which govern his arrest. In the *Forde* case, the police had watched an apartment for drug traffic for six months, and obtained information from a reliable informant of drug sales therein. They arrested four persons leaving the apartment with a shopping bag of marihuana. After some delay, after being informed by an assistant district attorney that a warrant was required to search the defendant's apartment, and after overhearing two of those arrested persons tell others who were to be released on bail to inform others at the apartment of the arrest, the police went to the apartment and arrested all the individuals present. They later obtained a search warrant for contraband issued solely on the basis of the evidence in plain view at the entry. While these facts suggested that the warrantless entry into the apartment and the arrest of persons found there may have been intended solely for the purpose of justifying the search for incriminating evidence, the Commonwealth sought to justify and legitimate the search as incident to a proper arrest on probable cause to believe that the persons were committing, or had committed, a felony.

In this set of circumstances, three judges of this court, in an opinion by Reardon, J., held: "[T]he Fourth Amendment prohibits a warrantless entry into a dwelling to arrest in the absence of sufficient justification for the failure to obtain a warrant." *Id.* at 806. The plurality opinion then enumerated those factors which might excuse the lack of an arrest warrant: "a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended." The same

Commonwealth *v.* LeBlanc.

opinion continued: "Additional considerations testing the reasonableness of police conduct are whether the entry is peaceable and whether the entry is in the nighttime." *Id.* at 807. Finding no exigent circumstances excusing the lack of an arrest warrant, the plurality held that the warrantless arrests were invalid, that the police could not justify the warrantless seizure of contraband on the "plain view" exception to the requirement for a warrant, and that evidence thus obtained should have been suppressed.[2]

In so far as *Forde* furnishes the standards that govern the legality of the arrest in this case, the police conduct here fully complies with those standards. Each of the factors set forth in that case as excusing a warrant is present here. The entry into the defendant's home, in broad daylight at 1:15 P.M., was peaceable, and no weapons were displayed. Mrs. LeBlanc, the defendant's mother, did not object to the entry. The crime of murder of a uniformed police officer was surely the type of "violent" crime contemplated by the *Forde* decision. The freshness of the crime and the fortuity of the police discovery of the car warranted police belief that the suspect might be armed. The defendant's mother said that the defendant was in the building; as she walked home from the car, it became

---

[2] Since much of the disagreement in the three opinions in *Commonwealth* v. *Forde, supra,* focused on recent decisions of the United States Supreme Court discussing the Fourth Amendment, it is useful to review decisions of that Court subsequent to *Forde.* In *United States* v. *Watson,* 423 U.S. 411 (1976), the Court held that the warrantless arrest of an individual in a public place on probable cause did not violate the Fourth Amendment. In *United States* v. *Santana,* 427 U.S. 38 (1976), this principle was applied to validate a warrantless arrest of an individual who retreated into a dwelling from a public place. While the various opinions purported not to reach the question whether the Fourth Amendment requires a warrant for an arrest in a home on probable cause, Mr. Justice Marshall, in dissent, protested that the Court had "all but answer[ed]" the question. *United States* v. *Watson,* 423 U.S. at 453-454. In so far as *Commonwealth* v. *Forde* can be said to be based on an assessment of the United States Supreme Court's likely authoritative determination of the issue, it may sometime be necessary to consider whether the decision in *United States* v. *Watson* and any other relevant decisions by that Court may have undermined the basis of plurality holding in *Forde,* but we need not do so for the purposes of this case.

apparent that she might inform her son of the police interest in the car. This urgency required and justified immediate police action.

Because the *Forde* opinion specified the necessity of "a clear demonstration of probable cause," and because the defendant contends there was no such demonstration, the issue of probable cause must be dealt with at somewhat more length.

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein* v. *Pugh,* 420 U.S. 103, 111-112 (1975), quoting from *Beck* v. *Ohio,* 379 U.S. 89, 91 (1964). In the present case the police surely had reasonable grounds to believe that they had discovered the vehicle driven by the person who had shot Sergeant Halloran. The car was locked, the police inspected the ignition, and saw nothing that suggested the car had been stolen.[3] After entering the defendant's home but before arresting him, they inquired whether it was his car, when he parked it, and whether anyone else had access to it. The defendant was thus given the opportunity to explain whether someone else had used or stolen the car. The defendant said that he had rented the car, had parked it the night before where it was found, and that no one else had access to the car. When these answers were added to the fact that the appearance of the defendant approximately matched the description of the man at the scene, the police placed the defendant under arrest.

There can hardly be a doubt that the convergence of the matching physical description and the defendant's control over the identified car gave the police probable cause to arrest. See *Draper* v. *United States,* 358 U.S. 307, 313 (1959). Since all the facts support the judge's conclusion that this case falls within the established exceptions to the warrant requirement, the arrest without warrant was law-

---

[3] While defense counsel, by argument and intimation, suggested that the car had been stolen, no evidence supported this suggestion.

ful. See *Commonwealth* v. *Saia,* 372 Mass. 53, 56-58 (1977) ; *Commonwealth* v. *Walker,* 370 Mass. 548, 555-556, cert. denied, 429 U.S. 943 (1976); *Commonwealth* v. *Moran,* 370 Mass. 10, 12 (1976).

The foregoing discussion alone fully resolves the defendant's arguments on the motions to suppress. Yet even if it were assumed that the defendant's arrest was unlawful, it does not follow that *Commonwealth* v. *Forde, supra,* would require the suppression of the statements the defendant made at the police station following his arrest. In the first place, it is somewhat inapposite to claim that a case which held that an unlawful arrest could not justify a seizure of evidence in plain view requires us to hold that an unlawful arrest compels the suppression of statements made without any apparent causal connection to the arrest. In the second place, the defendant is a high school graduate, the son of a police officer, and was twenty-two years old at the time of the interrogation. The Miranda warnings were read to him, and he responded that he understood and was willing to talk to the police. The judge found that "[t]he interrogation of the defendant was undertaken only after he had been fully informed of his rights and had made an intelligent informed waiver of his right to remain silent and was without any duress or force." As a factual matter, the transcript of his interrogation does not suggest any overbearing of the defendant's will or any lack of voluntariness in his statements. Indeed, the defendant did not make inculpatory statements in the sense of any statements that tied him directly to the crime. He tried to explain his whereabouts, and sought to establish an alibi that was later effectively refuted at the trial by his brother and a friend. It does not appear that the police in any way attempted to exploit the circumstances of the arrest, even assuming, contrary to our belief, that it was illegal. Thus, the defendant's reliance on *Wong Sun* v. *United States,* 371 U.S. 471 (1963), and *Brown* v. *Illinois,* 422 U.S. 590 (1975), is misplaced, because under that analysis, and on the undisputed findings of the trial judge, the defendant's statement "was sufficiently an act

of free will to purge the primary taint of the unlawful invasion." *Wong Sun* v. *United States, supra* at 486. See the cases decided by the Federal Courts of Appeals cited in *Brown* v. *Illinois, supra* at 603-604 nn.8, 9, which eschew a simplistic "but for" test in determining the effect of Miranda warnings on statements made following an illegal arrest. See *United States* v. *O'Looney,* 544 F.2d 385, 389 (9th Cir.), cert. denied, 429 U.S. 1023 (1976); *United States* v. *Rose,* 541 F.2d 750, 755-757 (8th Cir. 1976), cert. denied, 430 U.S. 908 (1977).

2. The defendant next argues that the .25 caliber automatic pistol seized in the cellar of his house should have been suppressed because the warrant under which the search was conducted was insufficient "because it does not give rise to probable cause to believe the gun is in the defendant's house." The defendant concedes in his brief that "the affidavit does establish . . . at best doubtful probable cause to believe the defendant committed the murder." We see no error in the judge's ruling that "[t]he issuance of the search warrant was based on information sufficient to constitute probable cause and was valid." The affidavit contained detailed information linking the defendant to the car identified as being at the scene; the defendant had admitted owning a gun and gave the unconvincing story that he had sold it to a "strange kid." The defendant was arrested at 2 P.M., ten and one-half hours after the shooting. The police had probable cause to believe that the gun would be concealed in the defendant's home, and the search warrant was thus properly issued. *Commonwealth* v. *Vynorius,* 369 Mass. 17, 22-26 (1975), and cases cited. *Commonwealth* v. *Haefeli,* 361 Mass. 271, 284-287 (1972), habeas corpus granted sub nom. *Haefeli* v. *Chernoff,* 394 F. Supp. 1079 (D. Mass.), rev'd, 526 F.2d 1314 (1st Cir. 1975). The alternative argument that the seizure of the gun was the fruit of an unlawful arrest has been resolved above.

3. The defendant argues that the judge erred by denying motions for directed verdicts of acquittal of murder in the first and second degree, manslaughter, and assault and

battery by means of a dangerous weapon. We consider first the propriety of the judge's action with regard to murder in the first degree. If there was sufficient evidence, in its light most favorable to the Commonwealth, to permit the jury to infer that the defendant committed murder "with deliberately premeditated malice aforethought" (G. L. c. 265, § 1), we need not consider the motions as to the lesser degree of murder or the lesser included crimes. *Commonwealth* v. *McInerney, ante,* 136 (1977). *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975).

Relevant to this point the jury had before them the following testimony of the defendant's activities on the evening before and on the morning of the slaying. From 4 P.M. to 8:30 P.M., on November 5, he was at the Lo-Cost Car Rental office in East Boston, extending his rental agreement on an orange 1974 Mazda RX-2. He spent from 9 P.M. to 11:30 P.M. at one lounge, was seen at another lounge at 12:30 A.M. on November 6, and was at the Libra Club from 1:15 A.M. to 1:50 A.M. that same morning.

On November 5, the defendant's father, an officer in the Boston police department, had been on patrol until midnight, then went home, and returned to duty at 6:30 A.M. of November 6. A .38 caliber bullet which was found in the lining of the victim's jacket, and which had been fired from the service revolver of the defendant's father, was not of the type issued to and used by the police. It was thus open to the jury to believe that the defendant returned to his house after 1:50 A.M. on November 6, took his father's police revolver, and substituted ammunition he had obtained for the type issued to and used by the police. Witnesses testified that three or four shots were fired at the scene, and that the bullets recovered had been fired from two different guns. Furthermore, the .25 caliber semiautomatic pistol that fired the fatal bullet could be discharged only if the slide was manually pulled back after the clip had been inserted.

The entire evidence, including the intentional use of two deadly weapons, was sufficient to permit the jury to find that the defendant killed the victim with deliberately pre-

meditated malice aforethought. *Commonwealth* v. *McInerney, ante,* 136, 140-148 (1977). *Commonwealth* v. *Greene,* 372 Mass. 517, 520 (1977). *Commonwealth* v. *Johnson,* 372 Mass. 185, 192 (1977). *Commonwealth* v. *Gagne,* 367 Mass. 519, 522 (1975).

In *Commonwealth* v. *Stirling,* 351 Mass. 68, 75-76 (1966), the defendant argued that the evidence was not sufficient to form the basis for a conviction of murder with deliberate premeditation. The court noted that the weapon used in the killing "although semi-automatic, required a separate pull of the trigger to fire each shot and the strength of the pull required was greater than that of most such weapons." *Id.* at 70. The victim had been shot in the head six times at close range. On these facts, plus the absence of any sign of struggle, the court held that the jury could properly find deliberately premeditated malice aforethought. *Id.* at 75. Furthermore, in response to the defendant's contention that the Commonwealth failed to show that the defendant was near the scene of the crime and that he committed the crime, the court made the following statement: "While it is true that there was no eyewitness to the crime and that the evidence comprised a large number of facts which joined together convinced the jury of his guilt the chain of circumstantial evidence in this case was extremely strong and was such as properly to persuade a jury." *Id.* at 76. This statement is fully applicable to the present case. There was thus no error in denying the motion for a directed verdict.

The defendant's return to his home to obtain his father's service revolver, the substitution of bullets, and the firing of several shots from two different guns suggest "the purposeful character of the premeditated malice," *Commonwealth* v. *Brooks,* 308 Mass. 367, 369 (1941), and permit the inference of a "prior formation of a purpose to kill." *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 230, cert. denied, 389 U.S. 916 (1967). *Commonwealth* v. *Tucker,* 189 Mass. 457, 494-495 (1905).

4. The defendant next argues that the trial judge erred by refusing to instruct the jury on voluntary and involun-

tary manslaughter. The test to be applied in deciding whether such instructions were necessary is "where any view of the evidence will permit a finding that the offence is manslaughter and not murder." *Commonwealth* v. *Zukoski,* 370 Mass. 23, 28 (1976), quoting from *Commonwealth* v. *LePage,* 352 Mass. 403, 419 (1967). *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 745-746 (1975). *Commonwealth* v. *Costa,* 360 Mass. 177 (1971). *Commonwealth* v. *Campbell,* 352 Mass. 387, 392 (1967).

Here, there was no evidence which would permit a finding of voluntary manslaughter — "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Zukoski, supra* at 28, and cases cited, quoting from *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). The sole basis for the defendant's contention is that the witness Oliva testified he heard a shot and then loud voices and then more shots. The voices came after a shot, and, further, were mere words which could not provide reasonable provocation. *Commonwealth* v. *Greene,* 372 Mass. 517, 521-522 (1977). *Commonwealth* v. *Bermudez,* 370 Mass. 438, 440 (1976). *Commonwealth* v. *Hartford,* 346 Mass. 482, 490-491 (1963). The victim's body showed no signs of any struggle and he had not fired his gun. There was simply no evidence of any facts which might constitute the basis for voluntary manslaughter.

Further, there was no evidence which would permit a finding of involuntary manslaughter — "an unlawful homicide, unintentionally caused ... by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth* v. *McCauley,* 355 Mass. 554, 560 (1969), and cases cited, quoting from *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967). On no view of the evidence could it be found that three or four bullets could have been discharged unintentionally. "Considering all the evidence, together with permissible inferences, we conclude that neither a finding of voluntary manslaughter nor a finding of involuntary manslaughter was warranted here."

*Commonwealth* v. *Caine,* 366 Mass. 366, 375 (1974), quoting from *Commonwealth* v. *Costa,* 360 Mass. 177, 184 (1971).

5. There was no error in the judge's charge on the manner in which intoxication may negate the specific intent needed for murder in the first degree. After the judge had charged the jurors fully and correctly on the nature of deliberate premeditation, he drew their attention to the evidence that the defendant had drunk some alcohol the evening of the crime. He told them they might consider whether the alcohol "has reached that state which ... affected the mind with reference to the matter of premeditation." In the context of the entire charge, the jury were properly and adequately instructed on this point.

6. There was likewise no error in the judge's instructions on reasonable doubt, which the defendant claims were insufficient as not containing the entire language of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). As was said in *Commonwealth* v. *Ferreira, ante,* 116, 130 n.12 (1977), quoting from *Commonwealth* v. *Therrien,* 371 Mass. 203, 209 (1976), and *Commonwealth* v. *Gerald,* 356 Mass. 386, 390 (1969), "Explanation of 'reasonable doubt,' we think, is usually best made in close reliance on the time tested language of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 [1850]." Yet the defendant does not suggest any way in which the judge's compressed version harmed him, or constituted anything more than permissible condensation. We have examined the charge on this issue and have found neither harm to the defendant nor legal error.

7. There was no error in permitting the testimony of a witness who said she had seen the defendant in possession of two guns — a smaller gun like the murder weapon and a larger gun — prior to the day of the murder. While the defendant argues that the only purpose of this evidence was "to portray the defendant as a dangerous and violent man," the testimony had the value of establishing the defendant's familiarity with guns, his prior possession of a gun like the murder weapon, perhaps his .25 caliber pistol or his father's .38 caliber service revolver, and his practice

of carrying guns to the Libra Club, where he was last seen before the victim's death. See *Commonwealth* v. *Caine,* 366 Mass. 366, 370-371 (1974), and cases cited; *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 229-230, cert. denied, 389 U.S. 916 (1967).

8. The defendant's last argued claim of error is entitled as follows: "The trial judge erred in refusing to allow defense counsel to inquire of Mrs. Patricia DiGrazia, the wife of the police commissioner of the city of Boston, who was a member of the venire, as to her knowledge of the instant case and her communications with other veniremen concerning the same in light of the fact that the victim was a police sergeant and her husband took an active part in the apprehension of the defendant." The full extent of the defendant's argument on this point is the unadorned and unexplained citation of *Commonwealth* v. *Eagan,* 357 Mass. 585, 588-589 (1970). That decision, at the particular pages cited, dealt with the effect of newspaper publicity, and affirmed that a judge need not poll each juror individually and that instructions might resolve the difficulties of prejudicial publicity. It has nothing to say about the duty or discretion of a judge to inquire of a member of the venire who is not called to sit on a case. The citation, without comment, of an inappropriate case is hardly the kind of argument we need consider. *Lolos* v. *Berlin,* 338 Mass. 10, 13-14 (1958). In any event, Mrs. DiGrazia had been separated from the venire for two weeks while sitting on a civil case. Each prospective juror was asked in considerable detail about his knowledge of the case, and the jurors drawn for the trial of the present case were sequestered throughout the trial. There was no error in this regard.

9. We have considered the case on the law and the facts and are of opinion that there is no injustice which requires the exercise of our powers to alter the verdict under G. L. c. 278, § 33E.

*Judgment affirmed.*