COMMONWEALTH *vs.* THOMAS E. DISANTO
(and thirteen companion cases [1]).

Suffolk. September 7, 1979. — November 15, 1979.

Present: HALE, C.J., GRANT, & KASS, JJ.

*Search and Seizure. Arrest. Constitutional Law,* Search and seizure, Arrest. *Evidence,* Admissions and confessions, Hospital record, Telephone conversation, Cross-examination, Common criminal enterprise. *Error,* Whether error harmful. *Practice, Criminal,* Trial of defendants together, Mistrial, Instructions to jury. *Joint Enterprise.*

At a criminal trial, there was sufficient evidence to warrant a finding that a warrantless entry into a dwelling was, in the circumstances, reasonable within the meaning of the Fourth Amendment and to warrant the denial of a motion to suppress items seized therein. [696-703]

At a criminal trial, there was no error in admitting in evidence the defendant's statement, in the presence of a police officer, to a medical historian that he did not know how he had injured his foot where the question was asked for a valid medical reason and without prompting by the police. [703-704]

At a robbery trial in which there was evidence that one of the robbers had been injured when struck by a police car, there was no error in admitting in evidence so much of a hospital record as contained a doctor's estimates as to when the defendant's injuries were sustained. [704-705]

At a criminal trial, the defendant was not prejudiced by the admission in evidence of tapes of telephone conversations between a codefendant and the codefendant's brother where the judge instructed the jury that they should limit their consideration of the tapes to the case against the codefendant and where nothing in the tapes implicated the defendant in the commission of any of the offences charged in any of the indictments. [705-706]

At a criminal trial, the judge did not err in excluding a question on cross-examination of a prosecution witness which was intended to

---

[1] Six of the companion cases are against Thomas E. DiSanto and seven are against James F. Brady, III.

show bias where the ruling was only directed to the particular question and there was nothing to indicate that the judge intended to foreclose all inquiry as to the possibility of bias in favor of the prosecution. [706-707]

There was no merit to a defendant's contention that the judge erred on a number of occasions in refusing to give the jury limiting instructions which would have prevented their considering the acts and declarations of the other defendants in the case against him. [708-709]

At a criminal trial, there was no error in the circumstances in the judge's advising the jury as to his rulings on the defendants' re- quests for limiting instructions. [709-711]

At the trial of a defendant and three codefendants on a theory of joint venture, the defendant was not prejudiced in the circumstances by the judge's failure to instruct the jury that the existence of a joint enterprise and the participation of each individual defendant in it must be initially established by independent nonhearsay evidence which is applicable and limited to that defendant before any acts or admissions of codefendants may be applied to any of the individual defendants. [711-713]

INDICTMENTS found and returned in the Superior Court on May 11, 1977, and May 13, 1977.

Pretrial motions to suppress evidence were heard by *Lappin,* J., and the cases were tried before *McGuire,* J.

*David A. Mills (Walter J. Hurley* with him) for James F. Brady, III.

*Jeffrey E. Rossman (David D. Patterson* with him) for Thomas E. DiSanto.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for the Commonwealth.

GRANT, J.  In the early afternoon of April 29, 1977, two Boston police detectives in an unmarked car happened upon the scene of an armed robbery which was being committed on the sidewalk next to a bank building in Mattapan Square. The detective who was driving the car ran it up onto the sidewalk and against the side of the building; the detectives were met with a hail of gunfire; both were wounded, as was a civilian bystander; four young men fled in a waiting car which sped off in the direction of Cummins Highway.

Thomas E. DiSanto, James F. Brady, III, Richard W. Gadsby and Kenneth Wightman were each separately indicted for armed robbery while masked, armed assault with intent to murder the two detectives and the by-stander, assault and battery on all three persons by means of a dangerous weapon, and the unauthorized use of an automobile. All the indictments were tried together in the Superior Court, where a jury convicted each defendant on every indictment against him. DiSanto's and Brady's appeals are now before us.[2] The appeals were argued together, but we shall discuss them separately because each defendant has argued different points.[3]

## DiSanto's Appeal.

1. DiSanto complains first of the denial of his motion to suppress certain articles which were seized in his apartment during the afternoon of the day of the robbery and shootings. The following is a summary of the relevant evidence at the pretrial hearing on that motion.

Other police officers discovered the detectives who had been shot within minutes after the incident. Those officers obtained brief descriptions of three of the four men who had climbed into the getaway car, including the fact that one of them had been wearing dark clothing, as well as a description and the registration number of the getaway car. The first police radio broadcast of the shootings, which included those descriptions, occurred at 1:42 P.M. At 1:55 P.M. another broadcast advised that the getaway car had been discovered at the end of a dead-

---

[2] Gadsby's appeal has not yet reached us. We are informed that Wightman's appeal was dismissed by the Superior Court following his escape from the Massachusetts Correctional Institution at Walpole, to which all the defendants were sentenced.

[3] We do not consider the convictions of unauthorized use of an automobile because the indictments for that offence were placed on file by consent.

end road leading into an abandoned quarry located near Cummins Highway in the Hyde Park district of Boston and known as Barry's Ledge. A man who lived at the end of that road informed the police that he had seen three young white men abandon the car, one of them carrying a case of a kind suitable for carrying a gun. The police were advised of the direction in which the men had fled, and Lieutenant (now Superintendent) Connolly of the Boston police assumed command of approximately 100 men, fifty vehicles and a State police helicopter which had joined the search for those who had entered the quarry.

The back window of the getaway car had been shot out. Connolly and some of his men examined the interior of the car, discovered that the ignition lock had been removed, and observed bullets, spent shell casings and a cotton work glove. Connolly, who was then communicating with his forces by walkie-talkie, ordered officers to enter the quarry from all the dead-end roads leading into its perimeter. He and several officers under his immediate direction then entered the quarry, where they followed a trail consisting of several cotton work gloves similar to the one found in the car, a package of cigarettes, discarded clothing (including a blue denim jacket), a chrome plated revolver, a carrying case for a rifle or a submachine gun, and a holster. No one was found. The geography and terrain of the quarry, the locations of the dead-end roads, the direction of the trail of objects which had just been found and the positioning of his forces that Connolly had already ordered were such that he reasonably concluded that the pursuit should be continued straight ahead in the direction of the extension of the American Legion Highway, which by then was the nearest public way not already covered by Connolly's forces. On the near side of the highway there was a Bradlee's store with its parking lot; on the far side was a complex of apartment buildings surrounded by secondary roads. Connolly radioed directions that both areas

be checked. Having in mind that he had discovered a denim jacket, Connolly specifically alerted the searchers to the possibility that one of the men they were looking for might be bare chested or wearing a T shirt. Every one had already been advised that the men in question were armed and dangerous.

Within minutes two police officers who had heard all the relevant radio broadcasts and who had already checked the Bradlee's parking lot arrived at the apartment complex. They encountered and questioned two young boys to whom they gave the broadcast descriptions, including the possibility that one of the men in question might be bare chested or wearing a T shirt. The boys advised that they had seen two men such as those described (one of them bare chested) running in the direction of an apartment building which faced on Navarre Street and contained four doors approximately at ground level. The officers drove their cruiser to the parking lot adjacent to the four doors, where they encountered a handyman who had seen no one running but who advised that persons meeting the broadcast descriptions lived in apartment 33A.

The door to 33A was flanked by two windows with the blinds drawn. One of the officers knocked on the door and rang the bell twice; there was no response. Both officers looked through a broken peephole in the door; they observed that lights were on in the apartment and heard the sound of a radio or stereo, but no person or movement was detected. Believing that the persons they wanted were inside, the officers dispatched two other officers who had just arrived to find the apartment manager and a pass key. The manager advised those officers that the apartment had recently been leased to DiSanto and proceeded to the apartment with a pass key. Meanwhile, two detectives had arrived. The manager unlocked the door, and the first two officers and the two detectives entered.

The entry was made without a warrant approximately ten minutes after the first two officers had arrived at 33A, approximately twenty minutes after their receipt of Connolly's order to check the apartment complex, and approximately one hour and twenty minutes after the first broadcast of the shootings. No one was in the apartment, but the officers observed in plain view on the kitchen table some ammunition, a dent puller and the cylinder of an automobile ignition lock.[4] A search warrant was promptly obtained, and the police then seized the items already described, as well as other incriminating items which were received in evidence at trial.[5]

The findings and rulings of the judge who heard and denied the motion to suppress conclude with the following: "The Court finds that the police had probable cause to believe that desperate armed men could be in 33A and that under the exigent circumstances the Commonwealth has satisfied its burden of proof that the initial entry into Apt. 33A without a warrant was justified. The Court finds the entry was made in the course of fresh pursuit. The Court rules the initial entry and subsequent entry and seizure under the warrant obtained were not unreasonable under the Fourth Amendment to the [United States] Constitution." DiSanto's attack is directed to the finding of exigent circumstances and to the ruling that the initial entry was not unreasonable.[6]

Subsequent to the decisions of the United States Supreme Court in *Warden, Md. Penitentiary* v. *Hayden,* 387 U.S. 294, 298-300 (1967), and *Vale* v. *Louisiana,* 399

---

[4] There was evidence at trial from which it could be found that the dent puller had been used to extract the ignition lock from the getaway car when the car was stolen several hours prior to the robbery and shootings.

[5] Among those items was a photograph of DiSanto holding a chrome plated revolver such as the one the police found in the quarry.

[6] It is common ground that the search warrant is meaningless if the initial entry was constitutionally prohibited. See *Commonwealth* v. *Forde,* 367 Mass. 798, 807 (1975), and cases cited.

U.S. 30 (1970), a plurality of the Supreme Judicial Court, in *Commonwealth* v. *Forde,* 367 Mass. 798 (1975), opined that "[t]he Fourth Amendment prohibits a warrantless entry into a dwelling to arrest in the absence of sufficient justification for failure to obtain a warrant" (367 Mass. at 806) and formulated a pragmatic check list of factors to be considered in determining whether a particular warrantless entry into a dwelling has been reasonable in the Fourth Amendment sense. For present purposes the factors on that list may be enumerated as follows: (1) the crime in question was one of violence and the suspect had been reported to be armed and dangerous; (2) probable cause to believe that the suspect has committed a felony and strong reason to believe the suspect is in the particular dwelling; (3) the entry has been made peaceably (preferably in the daytime); (4) a likelihood that the delay attendant upon securing a warrant would facilitate the destruction of evidence or property; (5) a likelihood that the suspect would escape if not promptly apprehended; and (6) some showing of a reasonable basis for believing that delay would subject the officers or others to physical harm (367 Mass. at 807). A majority of the court have subsequently adhered to the *Forde* decision in determining the validity of warrantless entries to arrest. See *Commonwealth* v. *Moran,* 370 Mass. 10, 12 (1976); *Commonwealth* v. *LeBlanc,* 373 Mass. 478, 485-486 (1977); *Commonwealth* v. *Boswell,* 374 Mass. 263, 269, 270, 271 (1978); *Commonwealth* v. *Franklin,* 376 Mass. 885, 889-891, 898-900, 903 (1978).

There is no real question as to the existence of any of the factors enumerated as (1) through (3) above. DiSanto, however, points to the agreed fact that the police were able to secure a search warrant within approximately an hour after their initial entry (see [4] above), and we note on our own that delay was not likely to facilitate the destruction of weapons. DiSanto also points to certain uncontradicted evidence at the hearing which is not reflected in any of the judge's findings of

fact, namely, testimony to the effect that the officers were not afraid of anyone's escaping from the apartment because they had learned from the handyman that the door through which they entered was the only means of entering or leaving the apartment (see [5] above) and testimony to the effect that none of the four officers who entered the apartment drew his weapon until after they had allowed the apartment manager (a woman) to step in front of them, unlock the door and turn the knob (see [6] above). DiSanto argues from those supposed deficiencies that the Commonwealth has failed to sustain its burden of proving justification for a warrantless entry to arrest.[7] It must be understood, however, that the Supreme Judicial Court has never expressly required the coexistence of all the factors enumerated above in order to validate a warrantless entry to arrest. It should also be understood that the court has expressly recognized the possibility that cases decided by the Supreme Court since the *Vale* case may impose less rigorous requirements than those enunciated in the *Forde* case. See *Commonwealth* v. *LeBlanc*, 373 Mass. at 485 n.2. Accordingly, we turn to those decisions.

In *United States* v. *Watson,* 423 U.S. 411 (1976), the Supreme Court, after careful review of the relevant authorities (including the decision of the Supreme Judicial Court in *Rohan* v. *Sawin,* 5 Cush. 281, 284-285 [1850]), held that an officer having probable cause to believe that a suspect has committed a felony may constitutionally arrest the suspect, even in the absence of exigent circumstances, if he makes the arrest in a public place (423 U.S. at 414-424). In *United States* v. *Santana,* 427 U.S. 38 (1976), the Supreme Court concluded that when an officer with such probable cause is in hot pursuit "a suspect may not defeat an arrest which has been set in

---

[7] It has not been argued that the officers' failure to find anyone in the apartment is of any materiality. See *People* v. *Eddington,* 23 Mich. App. 210, 221 (1970), aff'd 387 Mich. 551, 565 (1972).

motion in a public place, and is therefore proper under *Watson,* by the expedient of escaping to a private place" (427 U.S. at 43). It must be acknowledged that in both cases the Court purported not to reach the question whether the Fourth Amendment requires a warrant for an arrest in a dwelling on probable cause. The majority in the *Watson* case did, however, cite with approval (423 U.S. at 418 n.6) § 120.6(1) of the American Law Institute Model Code of Pre-arraignment Procedure (1975),[8] which expressly approves a warrantless entry into a dwelling in order to make an arrest in circumstances strikingly similar to those of the present case.

If we accept all the deficiencies in the Commonwealth's proof which have been asserted by DiSanto, they would not be decisive of the result which should be reached in this case. It was only by entering the apartment that the police could determine whether they had control of all the weapons which could be used against them. Compare *Warden, Md. Penitentiary* v. *Hayden,* 387 U.S. at 298-299. It was only by such entry that they could determine whether the chase had ended or whether their efforts should be promptly redirected into some other part of the apartment complex. See by analogy *Commonwealth* v. *Bumpus,* 354 Mass. 494, 500 (1968), cert. denied, 393 U.S. 1034 (1969); *Commonwealth* v. *Denault,* 362 Mass. 564, 566 (1972); *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976). And it cannot be denied that there are many circumstances in which a peaceable entry

---

[8]*"Demand to Enter and Entry onto Private Premises to Make an Arrest.* If a law enforcement officer has reasonable cause to believe that a person whom he is authorized to arrest is present on any private premises, he may, upon identifying himself as an officer, demand that he be admitted to such premises for the purpose of making the arrest. If such demand is not promptly complied with, the officer may thereupon enter such premises to make the arrest, using such force as is reasonably necessary, subject to the provisions of Section 120.7 regarding the use of deadly force." This section was also cited with approval in the concurring opinion of Mr. Justice White in the *Santana* case (427 U.S. at 44).

in the daytime can be less intrusive than a massive and lengthy stakeout. See *Commonwealth* v. *Boswell,* 374 Mass. at 270. Contrast *Commonwealth* v. *Hall,* 366 Mass. 790, 803-804 (1975) (entry to search rather than arrest).

In light of all the circumstances, we conclude that the warrantless entry in the present case was reasonable within the meaning of the Fourth Amendment and hold that the motion to suppress was properly denied.

2. There was evidence at trial from which it could have been found that one of the robbers had been struck by the detectives' car, when it was driven up onto the sidewalk, and had been temporarily pinned against the wall of the bank building; that one of the robbers had fallen as he limped toward the getaway car and had to be helped into it by one of his companions; that human blood had been discovered on the armrest of the right rear door of the getaway car and on the blue denim jacket which the police found in the quarry; that DiSanto was limping when he surrendered to the police on the morning of the second day following the robbery and shootings; but that he had walked normally on the day prior to those incidents. DiSanto was given the Miranda warnings immediately upon his surrender and was later taken to Carney Hospital, where it was discovered that he had two broken bones in his left foot and abrasions on his right arm. While at the hospital and in the presence of a Boston police officer and an investigator from the district attorney's office DiSanto was asked by a medical historian how the injuries had occurred and responded that he did not know how he had injured his foot. His response was admitted in evidence subject to his objection and exception.

No question was raised below as to the voluntariness of DiSanto's response; nothing in the record supports his present contention that he was in too much pain to be capable of formulating a rational answer to the question. The concession in his brief before us that the question was

asked for a valid medical reason and without prompting by the police removes any doubt as to the admissibility of the response. *Commonwealth* v. *Martin,* 357 Mass. 190, 193 (1970). *Commonwealth* v. *Roberts,* 6 Mass. App. Ct. 891, 891-892 (1978).

3. DiSanto complains of the admission in evidence of so much of his hospital record as contains estimates by a resident in orthopedics to the effect that the bones in DiSanto's left foot had been broken within the previous twenty-four to forty-eight hours and that the abrasions on his right arm had been suffered within the previous twenty-four to thirty-six hours. The first complaint is that there was a violation of so much of G. L. c. 233, § 79, as amended through St. 1974, c. 225,[9] as forbids the admission of any part of a hospital record which "has reference to the question of liability." There was nothing in the record which even remotely suggested how or where any of the injuries had been sustained. Compare *Cowan* v. *McDonnell,* 330 Mass. 148, 149 (1953); *Wadsworth* v. *Boston Gas Co.,* 352 Mass. 86, 93 (1967). "If the notations relate[d] to liability at all, . . . they [did] so only incidentally to the medical history and thus their admission does not require reversal." *Commonwealth* v. *Concepcion,* 362 Mass. 653, 656 (1972). There is nothing to the contrary in *Bouchie* v. *Murray*, 376 Mass. 524 (1978).

DiSanto also urges error in the admission of both time estimates because the hospital record contains a statement by the resident that he was "asked to evaluate [patient's left] foot for estimation of time of injury." The contention (which finds no evidentiary support in the hospital record or in the trial record) is that the estimates were requested by the police for use at trial. There was no error. *Commonwealth* v. *Franks,* 359

---

[9] "Records kept by hospitals . . . may be admitted by the court, in its discretion, as evidence . . . so far as such records relate to . . . treatment and medical history . . . but nothing therein contained shall be admissible as evidence which has reference to the question of liability."

Mass. 577, 578-579 (1971). If relevant under the statute, it was well within the judge's discretion to determine that one who had been appointed as a resident in orthopedics at Carney Hospital was professionally qualified to formulate the estimates objected to.

4. In the days following the robbery and shootings, and while the defendant Wightman was still at large, investigators in the office of the district attorney conducted various wiretaps pursuant to a warrant issued by the Superior Court and obtained tapes of two telephone conversations between Wightman and his brother which the prosecutor wished to use at trial. Transcripts of the tapes were seasonably supplied to counsel for DiSanto in the course of pretrial discovery, but the judge who heard all the pretrial motions suppressed any use of the tapes against DiSanto because of the prosecution's inadvertent failure to make any service on DiSanto of the type or in the manner required by G. L. c. 272, § 99 O 1, as appearing in St. 1968, c. 738, § 1. The trial judge allowed redacted versions of the tapes to be received in evidence at the trial, with an explicit instruction to the jury that they should limit their consideration of the tapes to the case against Wightman. There was nothing in the portions of either of the tapes heard by the jury which referred to DiSanto or implicated any defendant other than Wightman in the commission of any of the offences charged in any of the indictments.[10] Compare *United States* v. *Bailleul,* 553 F.2d 731, 733 (1st Cir. 1977).

DiSanto now asks us to find reversible error in the admission of the tapes, primarily because of what he as-

---

[10]The conversations were concerned with such things as a "wanted" poster the police had circulated concerning Wightman, the identities of possible informers (not including any of the defendants), a disguise Wightman had assumed, the return of a gun Wightman had borrowed from his brother, and plans for the two brothers to meet.

serts was a violation of the last sentence of § 99 O 1.[11] Several interesting questions have been argued in the briefs.[12] We find it unnecessary to answer any of those questions, even if they are viewed as having constitutional dimensions, because on a careful perusal of the entire record we are satisfied that any error under the statute (if there was one) was harmless beyond a reasonable doubt. See such cases as those cited in *Commonwealth* v. *Baker,* 368 Mass. 58, 77 (1975).

5. For like reasons we are not persuaded that the admission of the tapes against Wightman required a mistrial or a severance of the case against DiSanto. See *Commonwealth* v. *Clark,* 5 Mass. App. Ct. 673, 675-677 (1977).

## BRADY'S APPEAL.

6. One of the Commonwealth's early witnesses was an attendant in a gas station near the bank building who identified Brady as the driver of the getaway car as it sped off in the direction of Cummins Highway. On cross examination he was asked by Brady's counsel whether he had been fired from the gas station at some time subsequent to the date of the robbery and shootings. The answer was excluded on objection by the prosecutor. Counsel's offer of proof was as follows: "If asked, this witness will admit that on May 24, 1977, in the presence of [counsel for DiSanto], he made the statement, 'I don't

---

[11] "Failure by the Commonwealth to make . . . [the required] service . . . shall render such evidence illegally obtained for purposes of the trial against *the* defendant; and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or rules of court" (emphasis supplied).

[12] Neither party has addressed the question whether someone who is not a participant in a wiretapped conversation and who is not implicated in any offence by any aspect of the conversation has standing to object to the admission of the conversation in evidence against a codefendant.

need a lawyer. I am going to testify in the case against Brady.' It is my *suggestion* to the Court that it is proof of some offer, reward or inducement that has yet to be disclosed to the defendant, and that it is highly critical to the cross-examination of the credibility of this very crucial witness" (emphasis supplied).

There was no offer to show that the witness had in fact been fired, that he had been fired for any reason that would be of interest to the police, that the police were aware of the reason for his being fired, or that the police suspected him of having committed some offence, so as to give rise to an implication of bias in favor of the prosecution. Compare *Commonwealth* v. *Santos,* 376 Mass. 920, 925-926 (1978). Contrast *Commonwealth* v. *Ferrara,* 368 Mass. 182, 185, 187, 189 (1975); *Commonwealth* v. *Graziano,* 368 Mass. 325, 327, 330 (1975); *Commonwealth* v. *Hogan* 379 Mass. 190, 191 (1979); *Commonwealth* v. *Cumming,* 6 Mass. App. Ct. 884 (1978). It is clear from his ruling that the judge was "only directing [his] attention . . . to this particular question," and there is nothing to indicate that he intended to foreclose all inquiry as to the possibility of bias in favor of the prosecution. He allowed great latitude in questions as to the witness's apparent willingness to cooperate with the prosecution and his refusal to be interviewed by defense counsel.[13] Counsel never returned to the subject of the excluded question. We think this a clear case of the judge's having properly exercised his discretion in favor of excluding a prejudicial question and of counsel's having chosen not to pursue the point. See and compare *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 726-727 (1973); *Commonwealth* v. *Cheek,* 374 Mass. 613, 614-615 (1978).

---

[13]The judge had earlier advised the witness in the presence of all counsel that the witness was to decide for himself whether he wished to discuss the case with defense counsel, and the witness had said that he did not wish to do so. See *Commonwealth* v. *Doherty,* 353 Mass. 197, 209-211 (1967); cert. denied, 390 U.S. 982 (1968); *Commonwealth* v. *Carita,* 356 Mass. 132, 142-143 (1969).

7. It will be helpful to a consideration of Brady's re-maining assignments of error to have a brief outline of the general course the prosecution's evidence took throughout the trial.

It was clear from undisputed testimony introduced at the very outset that there were four individuals who had acted in concert in executing the robbery, that all four had been present during the shootings, and that all four had escaped together. The prosecution's basic problem was not so much one of proving the existence of a joint venture in order to fasten vicarious liability on particu-lar defendants as it was one of identifying the partici-pants in the venture. To that end the prosecution em-ployed both nonhearsay testimony which directly impli-cated each defendant in the venture and hearsay evi-dence of the acts and declarations of the various defend-ants during the course and in furtherance of the venture which tended indirectly to implicate each defendant as one of the venturers. *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103-104 (1974), and cases cited. The judge was frequently called upon to, and did, give limiting in-structions as to the particular defendant or defendants against whom various items of evidence could or could not be considered by the jury. The judge explicitly ad-vised the jury that it was for them to determine what weight should be accorded those items.

The evidence which directly implicated Brady as one of the members of the venture may be summarized brief-ly. A young blond male[14] was seen in the company of other young males in the immediate vicinity of the bank building minutes prior to the robbery and shootings; as already indicated, Brady was visually identified as the driver of the getaway car; his palm print was found on the rearview mirror of that car, which had been stolen only a few hours prior to the robbery and shootings; resi-

---

[14]Several portions of the transcript raise an implication that Brady is blond.

dents in the vicinity of the quarry saw either two or three young men, one of them blond, running through their backyards shortly after the car was abandoned; a brief time later Brady entered a home near the quarry where he was known to the occupants; he was then out of breath and gratuitously advised the occupants that he was being chased; while in the home he used the telephone to call someone to come and pick up "Tommy" (i.e., DiSanto) and himself; and he was picked up by a car a few minutes later.

On a number of occasions during the course of the trial Brady objected and excepted to the judge's refusal to give the jury limiting instructions which would have prevented their considering the acts and declarations of the other defendants in the case against him. No useful purpose would be served by detailing the specific items of evidence objected to. There is no genuine contention that any of the items was not relevant to at least one issue in the case or that when the items were admitted the independent evidence was insufficient to warrant a finding that Brady had been a member of the joint venture. The true basis of Brady's objections, as summarized in his brief, is that the admission of all the various items "dramatically and improperly increase[d] the danger that the jury would find [him] guilty by association." See *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965); *Commonwealth* v. *Szemetum,* 3 Mass. App. Ct. 651, 653-654 (1975). The judge expressly cautioned the jury against any such finding. On analysis, Brady's argument dissolves into a series of laments as to the strength of the Commonwealth's case and as to the rules of evidence which permitted a demonstration of that strength. No further discussion is necessary.

8. At one point in the trial the judge took under advisement a series of separate requests by counsel for all the defendants for limiting instructions with respect to the particular defendants against whom various items of evidence could be considered by the jury. On the follow-

ing morning the judge instructed the jury on the opera-
tion and effect of limiting instructions, gave them a brief
explanation of the theory of responsibility for participa-
tion in a joint venture or common criminal enterprise,
and explained his duty with respect to requests for limit-
ing instructions as follows: "The judge has to make a de-
termination at different stages of the case whether evi-
dence should be limited to the one against whom that ev-
idence is directed, or whether there is enough evidence
which would allow the court to say to the jury, 'You may
consider, under that theory, that the act of one is the act
of another.'" The judge then announced his rulings on
all the pending requests and saved the defendants' ex-
ceptions to those rulings. Finally, he said, "I am going
to add one other word to what I have just said to you
about limiting instructions; and that is, of course, this in
no way interferes with the absolute right of the jury to
make its determination as to what weight it will give to
any evidence whatsoever. The mere fact that's admissi-
ble doesn't interfere with your right, with your obliga-
tion to determine the weight of that evidence, if any."

Brady took no exception to any of the foregoing in-
structions. He now urges that the judge "improperly in-
vaded the province of the jury by expressly informing
[them] that he had denied the defendant's request for
limiting instructions at the same time he instructed
them on common enterprise." Specifically, he points to
that part of the discussion in *Commonwealth* v. *Beckett,*
373 Mass. 329, 337 n.3 (1977), in which the court said
that a judge should not disclose his rulings on limiting
instructions to the jury. The principal difficulty with
the argument is that Brady and all the other defendants
had voiced their requests for limiting instructions in the
presence of the jury, with the result that the only practi-
cal means of avoiding confusion in the minds of the
jurors was for the judge specifically to advise them just
what ruling he had made on each particular request. Nor
do we see that the judge did anything more than tell the

jury that he had determined that they could consider the evidence as limited by him and that they should decide for themselves what weight should be accorded to the evidence. There was nothing in any of the instructions which even remotely suggested that the judge had formed an opinion on the factual question whether Brady had been engaged in a common criminal enterprise with any of the other defendants.

In the circumstances, we perceive no error in any of the actions of the judge which are now complained of. If there is anything more to Brady's contention, it has not been made clear to us.

9. In the portion of his charge which was devoted to the subject of joint venture the judge instructed the jury as follows: "A joint venture, or common enterprise, occurs when two or more persons act together in order to commit a crime or crimes. In order to find that a person was part of a joint venture, you must find, *based upon the evidence that you have heard,* that a person rendered aid in the furtherance of that act" (emphasis supplied). Somewhat later the judge said, "I have given you limiting instructions many times, and I do that under the theory that a man is responsible for that which he does; and in regard to that, there was certain evidence that was introduced by the Commonwealth directly against only one of the defendants, and that was limited to him because it was introduced against him. But *you may have* [sic] *in your overall view of what you have heard,* accepting the limiting instructions, nevertheless, the existence or the non-existence of a common or joint venture" (emphasis supplied). At the conclusion of the charge Brady requested for the first time (see *Commonwealth* v. *Benders,* 361 Mass. 704, 707, 708 [1972]) an instruction that "the existence of a joint enterprise and the participation of each individual defendant in a joint enterprise must be initially established to the satisfaction of the jury by independent non-hearsay evidence which is applicable and limited to that defendant only before any

acts or admissions of codefendants may be applied to any of the individual defendants." No such instruction had been given during the course of the trial or in the charge, nor was the subject matter of the request mentioned in the supplemental charge.

There is no question that Brady was entitled to the substance of his request [15] (see Commonwealth v. McDermott, 255 Mass. 578, 581 [1926]; Commonwealth v. Flynn, 362 Mass. 455, 476-477 [1972]; Commonwealth v. White, 370 Mass. 703, 708 n.6 [1976]; Commonwealth v. Beckett, 373 Mass. at 337 n.3, 340), particularly in light of the fact that the portions of the charge which have been italicized above elided the essence of the request. The critical question on this branch of the case is whether Brady was harmed by the judge's failure to give the requested instruction. We have carefully reviewed all the various acts and declarations of his codefendants which are relied on by Brady in his brief in support of the proposition that he was so harmed. None of that evidence implicated Brady as one of the participants in a joint venture or had any tendency to corroborate other evidence which did.[16] When we weigh the evidence adverted to by Brady against the direct evidence of his participation in the joint venture which has been summarized in part 7 hereof we are not persuaded that the jury's verdicts were influenced by the absence of the re-

---

[15] We do not understand Brady to suggest that a particular defendant's own extrajudicial admission of participation in a joint venture cannot be considered by a judge or a jury in arriving at a preliminary determination of the question whether the defendant was one of the venturers.

[16] The evidence relied on in the brief consisted of extrajudicial statements of the codefendants such as: a statement by DiSanto regarding a change of clothing he had secured on the afternoon of the day of the robbery and shootings; the statement by DiSanto which is considered in part 2 of this opinion; statements by Wightman describing the crimes; statements by DiSanto and Wightman in the course of planning an escape from the Charles Street jail; and the wiretapped conversations which are referred to in part 4 of the opinion.

quested instruction. Compare *United States* v. *Bailleul,* 553 F.2d at 733-734. See also *Commonwealth* v. *McDermott,* 255 Mass. at 582; *Commonwealth* v. *Shea,* 323 Mass. 406, 415 (1948).

## CONCLUSION.

The judgments on all the indictments against DiSanto and Brady which were not placed on file are affirmed.

*So ordered.*