COMMONWEALTH vs. EDWARD DONOGHUE.

Hampden.    October 9, 1986. — November 7, 1986.

Present: GREANEY, C.J., PERRETTA, & SMITH, JJ.

*Search and Seizure,* Exigent circumstances, Probable cause. *Practice, Criminal,* Instructions to jury, Indictment. *Mayhem. Armed Assault in a Dwelling.*

A warrantless entry into an apartment by police officers at one o'clock in the morning and the seizure of certain items in plain view was justified by exigent circumstances where the police had probable cause to believe that the apartment was occupied by an armed and dangerous person who a short while earlier had committed an unusually brutal assault, where the occupant had failed to respond to an officer's calls and knocks at the door of the apartment, and where it was reasonable for the officers to conclude that obtaining a warrant from a magistrate who was "on call" would take a considerable length of time and that telephoning the landlord to acquire a passkey would take less time and would avoid an armed and forcible entry. [107-109]

On appeal from a mayhem conviction there was no merit to the defendant's contention that the indictment was defective in failing to allege that the defendant's assault disfigured or inflicted serious or permanent physical injury on the victim, where the indictment specified the date of the crime, asserted that the defendant "did slash and cut the face of" the victim, indicated that the maiming was accomplished "by means of a dangerous weapon, to wit, a knife," stated that the defendant performed the act "with malicious intent to maim and disfigure," and made explicit reference to violation of G.L. c. 265, § 14. [109-111]

On appeal from a conviction of armed assault in a dwelling with the intent to commit a felony, there was no merit to the defendant's contention that the judge's instructions on that offense created a substantial risk of a miscarriage of justice in that the judge failed to tell the jury that the felony intended "had to be independent of the underlying armed assault," where the judge instructed the jury that, in order to find the defendant guilty of the armed assault in a dwelling, they had to find that he intended to commit either assault and battery by means of a dangerous weapon or mayhem, offenses that had elements distinct from a simple assault on the occupant of the dwelling. [111-113]

INDICTMENTS found and returned in the Superior Court Department on January 17, 1985.

A pretrial motion to suppress evidence was heard by *John F. Moriarty*, J., and the cases were tried before him.

*Maureen B. Brodoff*, Committee for Public Counsel Services, for the defendant.

*Dianne M. Dillon*, Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. Before us are the defendant's convictions by a jury in the Superior Court of armed assault in a dwelling (G. L. c. 265, § 18A) and mayhem (G. L. c. 265, § 14). His contentions concern: (1) the denial of his motion to suppress evidence seized in a warrantless nighttime entry of his dwelling; (2) the adequacy of the mayhem indictment to charge a crime; and (3) the correctness of the judge's instructions on the elements of armed assault in a dwelling.

1. *Motion to suppress.* The judge's findings of fact on the motion to suppress disclose the following. On December 18, 1984, at some time between midnight and 1:00 A.M., Officer Gerald Sulewski of the Holyoke police department was in uniform and on cruiser duty with another officer. The two officers received a radio message to proceed to the Essex House on High Street to meet a Douglas Marsh. Marsh had just reported an emergency by telephone to the Holyoke police station., Officer Sulewski and his partner responded immediately to that message. When the police arrived at the Essex House, Officer Sulewski saw a man, identified as Douglas Marsh, walking toward it from the direction of a nearby café.

Marsh opened the door of the Essex House and led the officers to an apartment on the second floor. When Officer Sulewski entered the apartment, he saw the victim sitting on the floor, with his back against one of the walls. The victim's throat had been cut from ear to ear, his face had been slashed, and his abdomen had been cut open. He was still conscious but bleeding profusely and attempting to hold his intestines inside his abdomen with his hands. Officer Sulewski immediately called for back-up police assistance and an ambulance and then tried to assist the victim. He asked the victim

who had assaulted him. The victim responded with the name "Eddie" but was not able to provide a surname.

After the ambulance personnel arrived and took charge of the victim, Officer Sulewski asked Marsh what had happened. Marsh also told him that the victim's assailant had been a man named "Eddie." He too was unable to provide a last name but he was able to give a description of the man, and he told the police that he and the victim had been at "Eddie's" apartment that afternoon. He described "Eddie" as being about six feet, two inches tall, weighing about 200 pounds and having a muscular build. He said that "Eddie" had been wearing a tan camel's hair topcoat and a light-colored fedora type hat with a gold ornament on its band. He described the weapon used in the assault as a hunting knife with a green handle. He told the police that "Eddie's" apartment was in a building located at 182 Oak Street in Holyoke.

The building at 182 Oak Street is located about eight city blocks from the Essex House. Officer Sulewski and his partner took Marsh with them in their cruiser and drove to that location. Officer Sulewski opened a hallway door in the building with a knife, and the three men walked up the stairway to the top floor. When they arrived at the landing below the top floor, Marsh pointed to the door on the left and told the officers that that was "Eddie's" apartment. Officer Sulewski rapped loudly on the door and yelled out that he was a police officer. He received no response. As he continued to rap on the door, the door to the adjoining apartment was opened by its occupant, John O'Donnell. O'Donnell told Officer Sulewski that he had returned to his apartment at about 11:30 P.M. and that he had heard someone enter the adjacent apartment some time after that.

O'Donnell allowed Officer Sulewski to use his telephone to call the building's landlord. After a delay, the landlord arrived with a passkey. Officer Sulewski tried to open the door of the apartment but found that it was secured with a chain lock. He then went through O'Donnell's apartment to a rear porch on to which the back doors of both apartments opened. There was also a window through which Sulewski saw an unlit kitchen

and a light shining into a hallway from one of the interior rooms. He used the landlord's passkey to enter the kitchen and headed in the direction of the light.

When Officer Sulewski reached the lighted room (which proved to be a bedroom), he saw the defendant lying on a bed. He also noticed a tan camel's hair topcoat lying on the floor near the bed. He then opened the front door to allow other officers to enter and turned back toward the bedroom. As he did so, the defendant ran out of the bedroom, assumed a martial arts stance, and slammed into Officer Sulewski. Other officers subdued the defendant, and he was placed under arrest.

In addition to the tan camel's hair coat, the police also discovered a light-colored fedora type hat with a gold-colored ornament in plain view in the bedroom. They also found a fixed-blade knife with a green handle in plain view in an open drawer near the bed. They seized the coat, the hat, and the knife.

The police took the defendant out of the apartment onto the front stairway of the building. At that point, Marsh identified him as the victim's assailant. Marsh also identified the knife as the weapon used in the assault.

Based on these findings of fact, the judge reached the following conclusions:

> "At least at the point where O'Donnell informed the police officers that he had heard someone enter the apartment adjacent to his at some time after he had returned home at 11:30 P.M., the police had probable cause to believe that the apartment was occupied and that the occupant had just committed a very violent and possibly fatal attack on the victim. That occupant also had failed to respond to the officer's knocks and calls. It was after one o'clock in the morning. The occupant could have been in the process of destroying evidence of his crime. Considering the violent and bizarre nature of the crime, he could also have been dying as a result of a wound,

self-inflicted or otherwise. The circumstances were exigent.

"There was, to be sure, a magistrate on call in the city of Holyoke from whom a warrant could have been obtained. However, the time required to prepare and execute a proper affidavit, to rouse the magistrate, and to perform the other necessary paper work would have been far too long to prevent any mischief that might have been in progress within the apartment. The need of the officers to see what was going on in there was too urgent for that. Their decision to make a warrantless entry was, under the circumstances, entirely reasonable.

"Once inside the apartment they had a right to seize any evidence of the crime which they came upon in plain view. That included the topcoat, the hat and the green-handled knife. It follows that none of that evidence need be suppressed as evidence at the defendant's trial."    .

The defendant's attack is directed to the finding of exigent circumstances, and to the ruling, flowing from that finding, that the entry of the defendant's apartment was reasonable in the circumstances.[1] The question whether exigent circumstances excuse a warrantless entry into a dwelling is not a new one in this Commonwealth. See, e.g., *Commonwealth* v. *Forde,* 367 Mass. 798 (1975); *Commonwealth* v. *Moran,* 370 Mass. 10 (1976); *Commonwealth* v. *LeBlanc,* 373 Mass. 478, 483-486 (1977); *Selectmen of Framingham* v. *Municipal Court of the City of Boston,* 373 Mass. 783, 785-786 (1977); *Commonwealth* v. *Boswell,* 374 Mass. 263, 269-271 (1978); *Commonwealth* v. *Franklin,* 376 Mass. 885, 898-902 (1978); *Commonwealth* v. *Young,* 382 Mass. 448, 456-458 (1981); *Commonwealth* v. *Huffman,* 385 Mass. 122 (1982); *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 255-257 (1982); *Commonwealth* v. *Pietrass,* 392 Mass. 892, 897-900 (1984); *Commonwealth* v. *Kingsbury,* 7 Mass. App. Ct. 51, 54, *S.C.,* 378 Mass. 751 (1979); *Commonwealth* v. *DiSanto,* 8 Mass. App. Ct. 694, 696-703 (1979), cert. denied, 449 U.S. 855 (1980); *Common-*

---

[1] The defendant does not quarrel with the judge's conclusion that the evidence that was seized was, if the entry was lawful, properly seized under the plain view doctrine.

*wealth* v. *Cricones,* 12 Mass. App. Ct. 953, 954 (1981); *Commonwealth* v. *Amaral,* 16 Mass. App. Ct. 230, 231-235 (1983). The Commonwealth bears the burden of establishing that the entry was justified. Each case turns on an analysis of its own facts, but certain considerations have generally emerged as guidelines for resolution of the question.[2]

The application of these considerations to this case is straightforward. The crime was unusually brutal. Its perpetrator was armed and could reasonably be assumed to be very dangerous. There was clear probable cause and a strong demonstration that the defendant was in the apartment and armed. There could have been reasonable concern that the defendant might have someone else in the apartment or that evidence such as a weapon or bloody clothes, which could prove critical if the victim died, could be hidden or destroyed.

Although the police could have continued to stake out the apartment while a warrant was obtained from the magistrate "on call," their failure to do so does not require a conclusion that their conduct was unreasonable. The availability of a magistrate, and the alternative of the length of any stakeout, are two considerations to be weighed in the over-all picture. Their presence in a case is not preclusive of a finding of exigency. See *Commonwealth* v. *Bradshaw,* 385 Mass. at 256; *Commonwealth* v. *DiSanto,* 8 Mass. App. Ct. at 700-703. In view of the hour (1:00 A.M.), the police could reasonably have believed, for the reasons stated by the judge, that it would

---

[2] In *Commonwealth* v. *DiSanto,* 8 Mass. App. Ct. at 700, we characterized the considerations as a "pragmatic check list of factors" and identified them as follows:

> "For present purposes the factors on that list may be enumerated as follows: (1) the crime in question was one of violence and the suspect had been reported to be armed and dangerous; (2) probable cause to believe that the suspect has committed a felony and strong reason to believe the suspect is in the particular dwelling; (3) the entry has been made peaceably (preferably in the daytime); (4) a likelihood that the delay attendant upon securing a warrant would facilitate the destruction of evidence or property; (5) a likelihood that the suspect would escape if not promptly apprehended; and (6) some showing of a reasonable basis for believing that delay would subject the officers or others to physical harm . . . ."

take a considerable length of time to obtain a warrant and that the delay would risk additional danger to anyone else in the apartment building and the loss of evidence. The police adopted methods calculated to reduce the amount of time needed to get into the apartment and to avoid an immediate armed and forcible entry. The defendant argues that the action of the police in making a telephone call to the landlord, and waiting for the landlord instead of seeking a warrant, negates the existence of exigency. While we agree that the wait for the landlord is of some significance, we do not agree that it should carry the weight given it by the defendant. "[W]hether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young,* 382 Mass. at 456. We conclude that the police acted reasonably and in exigent circumstances.[3]

2. *Sufficiency of the mayhem indictment.* The defendant argues that the mayhem indictment is fatally defective because it does not allege that the defendant's assault disfigured or inflicted serious or permanent physical injury on the victim.[4] As the defendant did not raise this issue in the trial court on either a motion to dismiss or a motion for a required finding of not guilty, brought under Mass.R.Crim.P. 13(c) and 25, 378 Mass. 872, 896 (1979), respectively, our consideration is confined to whether the indictment fails to charge an offense, G. L. c. 277, § 47A, or whether there is a substantial risk that a

---

[3] The defendant relies heavily on the decision in *Commonwealth* v. *Huffman,* 385 Mass. 122 (1982), on the question of the existence of exigent circumstances. For the reasons explained in *Commonwealth* v. *Bradshaw,* 385 Mass. at 257 n.4, we find the reasoning in *Huffman* inapplicable to the facts of this case.

[4] As pointed out in *Commonwealth* v. *Hogan,* 7 Mass. App. Ct. 236, 245-246 & n.11 (1979), there are two branches to G. L. c. 265, § 14, the mayhem statute. Although the defendant argues that the indictment is defective under both branches of the statute, it is clear to us that the indictment is framed under the second branch "which allow[s] a conviction of mayhem for a more general range of injury." *Id.* at 246 n.11. Consequently, we do not deal with the defendant's arguments pertaining to the first portion of the statute.

miscarriage of justice otherwise has occurred. *Commonwealth* v. *De La Cruz,* 15 Mass. App. Ct. 52, 57 (1982). See also *Commonwealth* v. *Gonzalez,* 22 Mass. App. Ct. 274, 284 (1986).

The test of the sufficiency of the indictment is whether it fully and plainly, substantially and formally, describes the crime for which the defendant is held to answer. Article 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Welansky,* 316 Mass. 383, 395-396 (1944); *Commonwealth* v. *Gill,* 5 Mass. App. Ct. 337, 339 (1977). See also *Commonwealth* v. *Burns,* 8 Mass. App. Ct. 194, 195 (1979). An indictment must contain "a plain, concise description of the act which constitutes the crime or an appropriate legal term descriptive thereof." Mass.R.Crim.P. 4(a), 378 Mass. 849 (1979). An indictment will not be dismissed if the offense is charged with sufficient clarity to show a violation of law and to enable the accused to know the nature and cause of the accusation against him, to prepare an adequate defense, and to plead an acquittal or conviction in bar of future prosecution for the same offense. See G. L. c. 277, § 34; *Commonwealth* v. *McClaine,* 367 Mass. 559, 560 (1975); *Commonwealth* v. *Soule,* 6 Mass. App. Ct. 973, 973-974 (1979). See generally Smith, Criminal Practice and Procedure § 724 (2d ed. 1983). Although to do so is generally the better practice, the elements of the offense need not always be set forth in the indictment in the exact words of the statute. See *Commonwealth* v. *Munoz,* 11 Mass. App. Ct. 30, 32 (1980), reversed on other grounds, 384 Mass. 503 (1981). In some cases, an indictment may be read as inclusive of a fact which is instinctively conveyed by its specific allegations. See *United States* v. *Barbato,* 471 F.2d 918, 921 (1st Cir. 1973), and cases cited.[5]

---

[5] A comparison of *Commonwealth* v. *Palladino,* 358 Mass. 28 (1970), with *Commonwealth* v. *Bacon,* 374 Mass. 358 (1978), reveals the reasonableness of this approach. Both cases involve the element of possession in different crimes: *Palladino,* the possession of obscene materials; *Bacon,* the possession of a handgun. Both crimes require proof of knowledge for conviction. In both cases, the indictments failed to allege knowledge. Due to the uniquely ambiguous nature of obscene material, the court in *Palladino*

General Laws c. 277, § 79, prescribes no statutory form for charging an offense under the second branch of G. L. c. 265, § 14. The indictment here: (a) specified the date of the crime; (b) asserted that the defendant "did SLASH AND CUT THE FACE OF" the victim; (c) indicated that the maiming was accomplished "by means of a dangerous weapon, to wit, a KNIFE"; (d) stated that the defendant performed the act "with malicious intent to maim and disfigure"; and (e) made explicit reference to the defendant's conduct constituting a violation of G. L. c. 265, § 14. In its key respects, the indictment avoided generic terms and descended to specifics. In concluding that the indictment is sufficient, we note that the defendant sought no additional information by way of particulars, filed no motion to dismiss, and did not argue that the element of mayhem pertaining to disfigurement or serious injury had been inadequately stated or proved (a difficult prospect in view of the serious and permanent scarring of the victim's face), and did not challenge the instructions to the jury on the offense.[6] Rather, the defendant structured his defense principally around self-defense and the claim that his advanced state of intoxication negated the specific intent requirements necessary to convict him of mayhem and armed assault in a dwelling.

3. *Jury instructions.* The defendant argues that the judge's instructions to the jury on the indictment charging him with armed assault in a dwelling gave rise to a substantial risk of a miscarriage of justice. We do not agree.

Conviction under G. L. c. 265, § 18A, of armed assault in a dwelling requires proof of three elements: (1) entry of a

---

held that the failure to allege knowledge on the defendant's part was fatal to the indictment. See 358 Mass. at 31-32. By contrast, the court in *Bacon* refused to find that the failure to allege knowledge rendered the indictment defective. The court noted that, unlike obscene literature, "the characteristics of a gun are obvious." 374 Mass. at 361. While indicating that knowledge had been proven at trial, the court in *Bacon* also noted that there was "no general rule that knowledge must be alleged in all complaints and indictments as to crimes in which knowledge is a necessary element to be proved." *Ibid.*

[6] Indeed, the defendant's counsel on appeal concedes that the judge gave correct instructions on the elements of the crime of mayhem under the second portion of G. L. c. 265, § 14.

dwelling while armed (2) an assault on someone in the dwelling; and (3) a specific intent, accompanying the assault, to commit a felony. There was sufficient evidence presented by the Commonwealth to warrant the jury in finding the existence of each of these elements. Based on that evidence, the judge charged the jury in the manner set forth in the margin.[7] The defendant argues that "[t]his instruction was erroneous because it told the jury that the underlying armed assault need be committed only with the intent to commit an armed assault, namely, the aggravated assault, mayhem, or its lesser included offense, assault and battery with a dangerous weapon. It failed to tell the jury that the intended armed assault had to be independent of the underlying armed assault." The defendant argues that, just as the crime of felony murder requires that there be a felony independent of the homicide, § 18A requires a felony independent of the armed assault.

The instructions were proper because the felony that was the objective of the assault, either assault and battery by means of a dangerous weapon or mayhem, had an element or elements distinct from a simple assault. The issue is, in a sense, one of possible duplicitous convictions. "A single act may be an offence against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871). See *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306 (1972); *Salemme* v. *Com-*

---

[7] "Now, mayhem is a felony. Assault and battery by means of a dangerous weapon is also a felony. If you are satisfied beyond any reasonable doubt of the following facts, first that Mr. Donoghue did enter, go inside, in other words, the dwelling house occupied by [the victim], an apartment would constitute a dwelling house, if you are satisfied that he was armed with a dangerous weapon when he did so, and again when I say satisfied I mean satisfied beyond any reasonable doubt, if you are satisfied beyond any reasonable doubt that one, inside the dwelling he committed an assault upon [the victim], and you're further satisfied beyond any reasonable doubt that he did so with the specific intent of committing an assault and battery with a dangerous weapon, or intent with the intention of maiming or disfiguring, if you are satisfied of all of those facts beyond any reasonable doubt, then you should find him guilty as charged on that indictment."

*monwealth,* 370 Mass. 421, 423 (1976). In the case of assault and battery by means of a dangerous weapon, there is required, in addition to an assault, independent proof that a battery has been inflicted by use of a dangerous weapon. The mayhem, as presented to the jury, required independent proof that a dangerous weapon had been used and that the maiming inflicted by that weapon had resulted in serious physical injury to, or disfigurement of, the victim. The jury thus knew that conviction of the defendant on the armed assault charge would not be proper unless they should find that the assault was designed to accomplish a further factually distinct felony — either the aggravated assault made criminal by G. L. c. 265, § 15A, or the aggravated assault proscribed by G. L. c. 265, § 14. Contrary to the defendant's assertion, we do not think that the conceptualization of the events in these terms draws too fine a line or makes more out of what should be considered as essentially a single assault.

*Judgments affirmed.*